LOUIS GREENSPON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 39403–39406.    Filed October 28, 1954.

*Samuel W. Block, Esq.*, for the petitioners.
*Melvin A. Bruck, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Anna Greenspon, Docket No. 39404; Louis Greenspon, Docket No. 39405; and Louis Greenspon, Inc., Docket No. 39406.

144

OPINION.

ARUNDELL, *Judge:* This case presents three questions which depend on different and distinct facts. We can, therefore, deal with the questions separately.

## I. *Capital Gains Issue.*

The first question affects the individual petitioners, Louis Greenspon and his sister-in-law, Anna Greenspon, and concerns the treatment to be given to the proceeds of the sale of the industrial pipe which they received upon the liquidation and dissolution of the corporation, Joseph Greenspon's Son Pipe Corporation, in which they were equal stockholders.

There appears to be no dispute about the evidentiary facts. Louis Greenspon had been in the business of selling industrial pipe all his business life. He was first associated with his father's company until it collapsed in 1931. With the financial aid of Anna Greenspon's father, he formed in 1932 Joseph Greenspon's Son Pipe Corporation to carry on the business. Louis was the principal officer of the corporation and also its most dynamic salesman. Anna Greenspon, by reason of the money contributed by her father, owned 50 per cent of the stock. Eventually, quarrels and differences of opinion over policy arose between Louis, on the one hand, and Anna and her father, on the other. One of the principal matters of difference was the value of Louis' services to the corporation. He wanted an increase in salary for his efforts in directing the corporation and acting as its chief salesman. Anna and her father refused to vote him an increase.

These differences came to an impasse in the autumn of 1946. It was then decided to dissolve the corporation, liquidate its assets, and give each side its appropriate share and permit the different interests to go their separate ways. The corporation was dissolved, effective December 31, 1946. The assets, including accounts receivable and inventory of industrial pipe, were transferred to Louis and Anna Greenspon and they assumed all the outstanding obligations of the corporation, including the obligation to receive and pay for the industrial pipe on order by the corporation on the date of dissolution.

The individual petitioners then composed the partnership, Louis and Anna Greenspon, Liquidating Agents, and through this partnership they proceeded to dispose of the industrial pipe they had received from the corporation. It is the activities of this partnership in disposing of the pipe that are of concern here.

It is obvious that the industrial pipe which the individual petitioners received in liquidation was the stock in trade or the inventory

of the corporation. As such, the pipe was clearly not a "capital asset" within the meaning of section 117 (a) (1). Thus, had the pipe been sold by the corporation, the gain realized from it would have been income derived in the ordinary course of its trade or business. But, the corporation did not sell the pipe; it was distributed to petitioners who sold it through their partnership formed for the specific purpose of liquidating the assets, particularly the inventory of pipe, received when the corporation dissolved. The question has been presented in terms of the activities of the partnership: Was it a business? Was the pipe held for sale to customers in the ordinary course of the partnership's business?

We have held that it is wholly a question of fact whether property at the time of its sale can be characterized as a capital asset as defined in section 117 (a) (1) of the Internal Revenue Code of 1939,[3] or whether it is property held primarily for sale to customers in the ordinary course of a trade or business. To aid in the determination of this fact, courts have developed a series of tests to apply to the transactions under scrutiny. As we have said, in *W. T. Thrift, Sr.*, 15 T. C. 366, 369:

The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising.[4]

The individual petitioners place considerable emphasis on the claim that the only purpose for transferring the pipe from the corporation was to speed the liquidation of the corporation. They argue that no business could be established where the intent was primarily to dispose of an existing inventory. It is further argued that a mercantile business cannot be established or exist without the steady replenishment of inventory and neither the partnership nor the individual petitioners purchased any industrial pipe to add to the stock received, or already on order, when the corporation was dissolved.

Although property is sold to liquidate an investment, the manner in which it is sold or disposed of can constitute a trade or business. *R. J. Richards*, 30 B. T. A. 1131, affd. (C. A. 9) 81 F. 2d 369; *Florence H. Ehrman*, 41 B. T. A. 652, affd. (C. A. 9) 120 F. 2d 607, certiorari

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

  (a) DEFINITIONS.—As used in this chapter—

    (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

[4] Cf. *Boomhower* v. *United States*, 74 F. Supp. 997.

denied 314 U. S. 668. The foregoing cases indicate that, if a liquidating operation is conducted with the usual attributes of a business and is accompanied by frequent sales and a continuity of transactions, then the operation is a business and the proceeds of the sale are taxable as ordinary income. Or, as we have said, "It is undoubtedly true that where liquidation of an asset is accompanied by extensive development and sales activity, the mere fact of liquidation will not be considered as precluding the existence of a trade or business. Where, however, the active elements of development and sales activities are absent, the fact of liquidation is not, in our opinion, to be disregarded." *Frieda E. J. Farley*, 7 T. C. 198, 204.

Therefore, while it may be admitted that the purpose of the partnership, Louis and Anna Greenspon, Liquidating Agents, was to liquidate the pipe which had been distributed to the partners when their corporation was dissolved, we are nevertheless required to examine the manner in which they disposed of the pipe to determine whether the operation constituted a trade or business, and whether the pipe was held for sale to customers in the ordinary course of a trade or business.

As we view the facts, it appears that the methods of the individual petitioners in selling the pipe through their partnership were exactly the same as used by the corporation. Louis Greenspon was the chief salesman for the partnership as he was for the corporation; he tried to stimulate sales of the partnership pipe in the same manner as he did when the corporation was in business—by personal contact with prospective customers. He sought to sell the pipe to the same customers who bought from the corporation and, indeed, we note a number of sales in 1947 and 1948 by the partnership to the same purchasers from the corporation.

Also, we note that within a few weeks after the dissolution of the corporation Louis Greenspon formed a new corporation which he controlled. While he was trying to dispose of the pipe held by the partnership, he was simultaneously trying to build up the business of his own corporation. On paper, the distinction between the different roles was observed, but we are not convinced that the distinction was impressed upon the potential customer. We think that a potential purchaser would be interested primarily in pipe for his needs and at his price and it would be immaterial whether he bought it from Louis and Anna Greenspon, Liquidating Agents, or Louis Greenspon, Inc. In either case the purchaser saw Louis Greenspon. We think that unquestionably his dual role undermines the effectiveness of the argument that the partnership did not add to its inventory. It did not have to because it was so closely allied to the new corporation which could supply those needs of the customers which the partnership could not.

Finally, the number and value of the sales made by the partnership were characteristic of a business. There were 127 separate sales resulting in aggregate gross receipts of $579,701.70 in 1947; there were 11 separate sales in 1948 resulting in gross receipts of $135,620.71.

Nor is this case like *Estate of Jacques Ferber*, 22 T. C. 261. In that case, the executors of the decedent's estate operated his fur business for a short time to sell off part of the inventory and to preserve the goodwill of the business until a purchaser could be found. Eventually, the executors found a purchaser willing to buy the name, fixtures, and some of the furs, but not all the inventory. They accepted and were left with a quantity of furs which they sold at three public auctions.

We held that the proceeds of the auction sales were entitled to capital gains treatment. It should be observed that in the *Ferber* case, *supra*, the proceeds of the merchandise sold by the executors before they sold the store were not in issue. They operated the store in the same manner as their decedent. We were concerned only with the auction sales which disposed of the furs left after the store was sold. These sales were quite different from those made during the operation of the store.

The fact that there was a difference between the entity which originally owned the furs and the entity which sold them while significant was not controlling. The same observation is pertinent here; it is not primarily significant that the pipe once owned by the corporation was sold by the partnership. What is controlling is the manner in which the partnership disposed of the pipe.

In summary, when all the facts are considered, we think they show that the partnership, Louis and Anna Greenspon, Liquidating Agents, was essentially a business enterprise and that the pipe sold by the partnership was held for sale in the ordinary course of the partnership business. The details stressed by the petitioners such as the lack of purchases and the gradual tapering off of the number of employees and the sales, while important considerations to be taken into account, are not sufficient to change our opinion. When the whole record is viewed, we think it is inescapable that the partnership was as much a business as was the corporation it succeeded and the proceeds from the sales of pipe by the partnership were as much the proceeds from the sale of stock in trade as were the sales of pipe by the corporation. Therefore, the gains realized by each of the individual petitioners from the sale of pipe in 1947 and 1948 represent ordinary income and not gains from the sales of capital assets.

## II. *Promotional Expense Issue.*

In 1944, Louis Greenspon acquired a farm located in the suburbs of St. Louis. He purchased the property with his own funds and took

title in his own name. He moved to the farm in 1945 and it was his home during all the years in issue.

Part of the expenses of landscaping the farm and maintaining it, and the cost of certain capital items such as machinery and tools were charged to Joseph Greenspon's Son Pipe Corporation, in 1946, and to Louis Greenspon, Inc., in 1947, 1948, and 1949, as operating expenses of the corporations. Also, in 1948 and 1949 the cost of certain capital items used exclusively on the farm, such as a tractor and a utility truck, was paid by Louis Greenspon, Inc., and these items were treated as capital additions to the corporate plant and deductions for depreciation of this equipment were taken on the corporation's returns for these years. However, the bulk of the expenses for establishing the farm and for maintaining it was paid by Greenspon individually.

The corporations deducted their expenditures for farm items other than the capital items mentioned above as ordinary and necessary business expenses. The justification is that, periodically, customers were entertained at the farm. The farm was claimed to be an important part of the sales promotion program of the companies. It is argued that Greenspon's relatively small companies had to develop some unique approach to customers to compete effectively with the pipe manufacturers who could afford nationwide advertising programs. According to the argument, it was determined to acquire a farm and convert it into a horticultural showplace where business guests could be entertained. It was pursuant to this idea that Greenspon purchased the farm and began developing it. It is alleged that only so much of the additional expenses of establishing and maintaining the farm as were attributable to creating pleasant surroundings for the entertainment of business guests were charged off to the corporations. The cost of the food and beverages consumed on the farm was not charged to the corporations.

The respondent disallowed all the expenses related to the farm which had been deducted by the corporations. Furthermore, he added to Louis Greenspon's individual income the farm expenses which had been paid by Louis Greenspon, Inc., in 1947, 1948, and 1949 on the theory that the payment of these expenses was in the nature of a corporate distribution to Greenspon in each of these years.[5]

For 1948 and 1949, the respondent disallowed the deduction taken by Louis Greenspon, Inc., for depreciation on the capital equipment which had been purchased for use on the farm. The respondent added

---

[5] For 1946 the amount disallowed Joseph Greenspon's Son Pipe Corporation results in additional income to that corporation and a deficiency which is claimed from Louis Greenspon as transferee. He does not contest transferee liability. (Docket No. 39403.) No additional income has been attributed to Louis Greenspon in 1946 because of the farm expenses paid by Joseph Greenspon's Son Pipe Corporation.

the cost of these items to Louis Greenspon's personal income for 1948 and 1949, again on the theory that these purchases by the corporation were in the nature of a distribution of a dividend to him.

It is well established, of course, that promotional expenses and reasonable expenses for entertaining clients and customers are ordinary and necessary business expenses.[6] There must, however, be a reasonably direct relationship between the expenditures and the business advantages which are expected or actually realized. It is equally certain that personal entertainment and personal living expenses cannot be charged off as business expenses. The classification of a particular expenditure is a matter of fact and depends on the circumstances of each case. *Louis Boehm*, 35 B. T. A. 1106.

The burden of proof is on the petitioners to show that the farm expenses paid by the corporations were legitimate business expenses. We do not think that burden is met by showing that, periodically, business associates, or potential customers, were entertained at the farm. This is nothing more than the usual practice in the business community; corporate officers often entertain as guests the clients or customers of their corporations. The expenses incurred in such entertainment are not usually business expenses of the corporations. In certain circumstances, they may be. As we have said, in *Reginald Denny*, 33 B. T. A. 738, 744:

Entertainments in the home may be prompted by either social or commercial motives or they may partake of both characteristics, with either element predominating. There is a wide gap between entertaining for purely business purposes at public places, where even though exact costs are not known they may be estimated with some degree of accuracy, cf. *Blackmer v. Commissioner*, 70 Fed. (2d) 225, and entertaining in the home, where not only the family is maintained but where, if the general standard of social conduct obtains, there are at least some personal or social guests. Having due regard for the norm of conduct of the average home, we should have very clear evidence on the point before we say that any particular percentage of its activities are purely commercial.

Of concern also is the fact that here we have a corporation taking deductions for expenditures on the private home of its dominant

---

[6] *Internal Revenue Code* of 1939.

SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions:
    (a) EXPENSES.—
      (1) TRADE OR BUSINESS EXPENSES.—
        (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

stockholder and chief executive officer. In such circumstances, the proof should be very clear and very certain that the expenses charged to the corporation were legitimate busines expenses of the corporation. Otherwise, the opportunity for abuse would be great. We find no such evidence in this record. To the contrary, from all the evidence, we are convinced that the farm was primarily Louis Greenspon's home, and the use made of it to entertain business guests was incidental. Cf. *Ned Wayburn*, 32 B. T. A. 813.

However, even if there were proof in the record of the extent to which the farm was used to entertain business guests, we could not allow deduction of the particular expenses which have been charged to the corporations here. We think that it is too remote and too extraordinary to classify expenditures for farm tools, fertilizers, shrubbery, etc. as promotional expenses or as entertainment expenses. Nor are we able to accept the contention that these expenses are justified because the farm was developed as a sort of horticultural showplace to impress potential customers. The relationship between the aesthetic stimulation of a potential customer from the view of an unusual array of shrubbery and flowers and his order for pipe is much too oblique.

Therefore, this is not like a case where a corporation is reimbursing a corporate officer for expenses he has incurred in his home in the direct entertainment of customers of the corporation. In such cases, in the past, we have allowed the corporation to deduct the disbursements to its officers even though we had to approximate the expenses. Cf. *Ned Wayburn*, *supra*. Here, it is admitted that none of the expenses for direct entertainment were paid by the corporation. The cost of food and beverages consumed on the farm was paid by Greenspon personally. On analysis, the distinction between the two situations may seem mechanical and perhaps it is, but this merely emphasizes that the deduction of any expenses normally considered personal should not be allowed without clear and distinct evidence that the expenses were for business purposes.

The respondent has determined that the farm expenses charged to the corporations and the cost of the farm machinery and equipment which were owned by Louis Greenspon, Inc., but used exclusively on the farm, were corporate distributions to Louis Greenspon. We agree insofar as the farm expenses are concerned, but disagree as to the cost of the machinery and equipment which were owned by the corporation. It now appears to be well settled, particularly in cases where a dominant stockholder withdraws or disburses corporate funds for his personal use, without intention of repayment, that the amounts withdrawn are the equivalent of corporate distributions, the informality of the transaction notwithstanding. *L. J. Christopher*, 13 B. T. A.

729, affd. 55 F. 2d 527; *C. W. Murchison*, 32 B. T. A. 32; *Charles A. Rogers*, 38 B. T. A. 16, 22, affd. 111 F. 2d 987. Therefore, the amounts paid from the corporate treasury for operating and maintaining the farm should be added to Greenspon's individual income in the years in issue. *Ned Wayburn, supra.* However, while it is appropriate for the respondent to disallow depreciation taken on the farm machinery and equipment owned by Louis Greenspon, Inc., we do not think that the cost of these items should be added to Greenspon's personal income. It is not disputed that the title to these items remained with the corporation and, while they may have been used on the farm, Greenspon did not own them, and their cost should not be included in his income. We do not decide the question whether under similar facts a stockholder making use of property owned by a corporation should be charged with receiving income to the extent of the value of the use of such property, as this question was not raised by the Commissioner and probably for that reason no facts are given us by which we could determine the value of the use for inclusion in income.

### III. *Installment Sales Issue.*

By an appropriate election in its return for the year 1949, Louis Greenspon, Inc., reported its income from certain sales made during the year on the installment basis. The respondent does not question petitioner's method of election (see *Gus Blass Co.*, 9 T. C. 15, 34, 35), but challenges the right of the corporation to report on the installment basis, contending that it does not meet the requirements of section 44 (a) of the Internal Revenue Code of 1939.[7] Generally, section 44 (a) provides that a vendor who "regularly sells or otherwise disposes of personal property" on the installment plan may report income on the installment basis under regulations promulgated by the Secretary. There is no argument here as to the sales involved or the amounts that are to be reported one way or the other. The only question is whether Louis Greenspon, Inc., was regularly engaged in the sale of personal property on the installment plan in 1949. This is simply a question of fact to be determined according to several criteria long ago established by this Court. They are: Number of installment sales, the frequency of installment sales, the ratio or proportion between installment sales and total sales, and the general holding out to

---

[7] SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

the public. *Marshall Brothers Lumber Co.*, 13 B. T. A. 1111, reversed and remanded pursuant to stipulation, without opinion, 51 F. 2d 1081; *Davenport Machine & Foundry Co.*, 18 T. C. 39.

Louis Greenspon, Inc., recorded installment sales on four different invoices to two different customers during 1949. Two of these invoices to one customer were made out on the same day.

The total consideration for the four installment sales amounted to $175,203.42, or 22 per cent of the total consideration for all sales, including installment sales, of the corporation during 1949.

It was generally known in the trade and among its customers that the company would sell on the installment basis in 1949. This position was forced by competition.

No other installment sales were made during this year, but Joseph Greenspon's Son Pipe Corporation, a predecessor, had made installment sales and it was the practice of Louis Greenspon, Inc., in years subsequent to 1949 to make sales on the installment basis.

We think the foregoing facts establish that the petitioner corporation was regularly selling on the installment basis in 1949. While there is not the frequency and number of sales which would ordinarily be of considerable weight, a very substantial portion of the gross proceeds from sales during the year was from installment sales and, in our opinion, this is just as significant a fact as the number of sales in this particular type of business. Cf. *Davenport Machine & Foundry Co., supra.*

Having concluded that the petitioner corporation is entitled to report income from installment sales in 1949 on the installment basis, we next proceed to the complication created by the sale to Talco Pipe Line Co. in 1948. At the time this sale was concluded in July 1948, the purchaser agreed to pay cash upon receipt of the invoice. However, in November 1948, an adjustment was made in which the petitioner corporation agreed to take payment in five equal installments, plus a small cash payment at the outset. Five notes were given by the purchaser; one was paid in 1948, plus the cash balance, and the other four were paid in 1949. The petitioner corporation reported the entire gain on the sale in its 1948 return, it then being on an accrual basis, and it paid the full tax thereon.

The respondent contends that, if we determine that the corporation was regularly selling on the installment plan in 1949, and entitled to report its income from such sales on the installment basis, then the petitioner must include in its gross income in 1949 the payments made on account of the Talco sale in 1948. The authority for respondent's

position is in section 44 (c) of the Internal Revenue Code of 1939,[8] which specifies that in the "year of change or any subsequent year," a taxpayer reporting on the installment basis shall not exclude "amounts actually received during any such year on account of sales or other disposition of property made in any prior year * * *." *Blum's, Inc.*, 7 B. T. A. 737, *H. Rothschild*, 26 B. T. A. 345.

The petitioner resists this contention on procedural grounds and on the merits. The petitioner asserts that the first time that the respondent claimed that the portion of the proceeds of the Talco sale, which was actually received in 1949, should be reported as income in that year was in his opening brief. No mention is made of this sale nor any claim made for a deficiency for 1949 on account of this sale in the deficiency notice. No mention is made of it in the petition,[9] or in the respondent's answer. The first mention of the sale is in a stipulation[10] where the facts concerning this sale are agreed to. The respondent's arguments on the merits are contested in the petitioner's reply brief.

We think it is doubtful that the petitioner was unaware of the respondent's position on the Talco sale until after the trial. The respondent's basic position is that the corporation was not selling on the installment basis in 1949. This position precluded any mention of the Talco sale in the deficiency notice. However, without passing on the procedural aspects of this question, we shall proceed to dispose of it on the merits, and because our view of the merits is favorable to the petitioner, we think there will be no prejudice to either side.

While the statute or the regulations do not specify that the "sales" mentioned in section 44 (c) are "installment sales" when originally consummated, this is clearly the intent of the provision. In a recent ruling, Rev. Rul. 54-111, 1954-1 C. B. 76, 77, for example, the respondent said:

The provisions of section 44 (c) of the Code, * * * and section 39.44-1 of Regulations 118,[11] requiring a taxpayer to include in the computation of its net income from installment sales for the year of change from the accrual to the

---

[8] SEC. 44. INSTALLMENT BASIS.

(c) CHANGE FROM ACCRUAL TO INSTALLMENT BASIS.—If a taxpayer entitled to the benefits of subsection (a) elects for any taxable year to report his net income on the installment basis, then in computing his income for the year of change or any subsequent year, amounts actually received during any such year on account of sales or other dispositions of property made in any prior year shall not be excluded.

[9] Docket No. 39406.

[10] *Ibid.*

[11] A similar requirement is found in section 29.44-1 of Regulations 111, applicable to years in issue.

installment basis or any subsequent year amounts received on account of sales made in a year prior to the change, are applicable only in a situation where a taxpayer making sales on the installment plan elects to change its method of reporting installment sales income from the accrual to the installment basis. Furthermore, such provisions have reference *only* to amounts received on account of *installment sales* made in prior years, not to amounts received on account of sales on open account. [Emphasis added.]

Thus, the question is whether the Talco sale is an installment sale, or some other type of transaction. Neither the statute nor the regulations define an installment sale in the case of dealers in personal property. The regulations contain the observation that "Dealers in personal property ordinarily sell either for cash or on the personal credit of the purchaser or on the installment plan." (Sec. 29.44–1 of Regs. 111.) But this language only suggests that there are different contracts than the installment sale.

The respondent contends that, because the petitioner corporation altered the terms of the Talco contract by taking notes payable over a 2-year period, the contract automatically was converted from a cash sale to an installment sale. Inherent in this position is the inference that every sale made on the credit of the purchaser evidenced by obligations payable periodically is an installment sale. We do not think so. A present sale can be consummated with provision for deferred payment of the consideration and such a transaction is not an installment sale and cannot be reported on the installment basis. Cf. *Walter I. Bones*, 4 T. C. 415, 422–423.

In 1948, the petitioner corporation was not regularly selling on the installment plan. The Talco sale was apparently the only contract in that year in which it agreed to accept the purchaser's notes for the payment of the contract. This single aberration in the policy of the company made necessary by the particular exigencies of one customer does not establish a pattern for the year.

Upon receipt of Talco's notes, which were treated on the corporation's books as having full face value, the petitioner, being on the accrual basis, realized the full proceeds of the sale and was obliged to report the full gain thereon in 1948. This was a completed present sale with payment deferred, not an installment sale, and, therefore, such amounts as were received in 1949 on account of payment of the Talco notes do not have to be included by the petitioner corporation in reporting its income from installment sales in that year.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*