International Trading Co., a corporation, et al. [1] v. Commissioner. International Trading Co. v. Commissioner
Docket Nos. 62620, 57349-57352, 63560-63563. 58-104.
United States Tax Court
T.C. Memo 1958-104; 1958 Tax Ct. Memo LEXIS 130; 17 T.C.M. (CCH) 521; T.C.M. (RIA) 58104; May 29, 1958
A. L. Skolnik, Esq., 710 North Plankinton Avenue, Milwaukee, Wis., for the petitioners. Thomas J. Donnelly, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax and additions to tax under Section 294(d) of the Internal Revenue Code of 1939 as follows: Fiscal
Years
Additions to
ended
Defi-
tax under
Petitioner
8/31
ciency
Sec. 294(d)
International Trad-
ing Co.
1951
$ 4,553.29
1952
7,128.46
Calendar
Years
Michael and Rae
Shapiro
1948
$14,163.57
1949
8,864.92
1950
23,948.16
$3,244.33
1951
47,104.08
2,871.25
1952
10,952.92
1,899.72
Julius and Beatrice
Rubin
1948
$10,899.74
$ 658.16
1950
5,057.60
353.55
1951
5,112.26
329.58
1952
5,514.20
Bernard and Doris
Libowsky
1948
$11,931.53
$ 564.10
1950
2,702.80
369.71
1951
3,645.47
436.06
1952
4,075.00
Jack and Lillian
LaKam
1948
$11,885.73
$ 498.92
1950
2,803.12
431.96
1951
3,107.70
492.61
1952
3,922.84
*131 Certain contested adjustments have been settled by stipulation and can be cared for in computations pursuant to Rule 50. The issues remaining for decision are (1) whether certain stock and cash placed in escrow in 1948 were includible in income of the individual petitioners in that year; (2) whether certain of the individual petitioners may increase the basis of stock sold by the amount of a debt they assumed, or in the alternative may deduct the amount as a bad debt; (3) whether a payment received by Michael Shapiro was income or a repayment of a loan; (4) whether attorneys' fees paid by Michael and Rae Shapiro in connection with tax litigation are deductible expenses; (5) whether International Trading Co. is entitled to deduct as business expenses the costs of maintenance and depreciation on certain property used by its stockholders; (6) whether the stockholders received taxable income from the use of the property and, if so, the amount of such income; and (7) whether certain of the individual petitioners received capital gain or ordinary income upon the sale of certain unimproved property. The returns of the petitioners were filed with the collector or director of internal *132 revenue at Milwaukee, Wisconsin. Findings of Fact General Facts The petitioners Michael and Rae Shapiro, Jack and Lillian LaKam, Julius and Beatrice Rubin, and Bernard and Doris Libowsky are husbands and wives. Lillian, Beatrice and Doris are daughters of Michael and Rae Shapiro. Each couple filed a joint income tax return on the cash basis for each of the taxable years 1948 through 1952. International Trading Co. is a Wisconsin corporation organized in 1946. Its records are kept and its tax returns filed on an accrual basis of accounting and its returns cover fiscal years ended August 31. In the fiscal years ended in 1948 through 1952 it was engaged in the brewery supply business, sold containers on commission, held real estate and collected rents therefrom. In 1950 and 1951 it was also engaged in licensed warehousing. In the taxable years its officers were Shapiro, Rubin, Libowsky, and LaKam and its stock was owned as follows: Prior to September 1, 1950
Beatrice Rubin
50 shares
Doris Libowsky
50 shares
Lillian LaKam
50 shares
Michael Shapiro
1 share
Fibre Container Corp.
99 shares
TOTAL
250 shares
After August 31, 1950
Doris Libowsky
56 shares
Lillian LaKam
56 shares
Beatrice Rubin
56 shares
Cynthia Libowsky - daughter of
Bernard & Doris Libowsky
41 shares
Nancy Libowsky - daughter of
Bernard & Doris Libowsky
41 shares
Patricia LaKam - daughter of
Jack & Lillian LaKam
41 shares
Bruce LaKam - son of Jack &
Lillian LaKam
41 shares
Harley Rubin - son of Julius &
Beatrice Rubin
41 shares
David Rubin - son of Julius &
Beatrice Rubin
41 shares
Michael Shapiro, Beatrice Rubin,
Lillian LaKam and Doris Li-
bowsky, as trustees of a voting
trust for the benefit of the
grandchildren of Michael Sha-
piro
261 shares
TOTAL
675 shares
*133 The stockholdings in Fibre Container Corporation were: Michael Shapiro
250 shares
Jack LaKam
1 share
Jane C. Lusocki
1 share
Bruce LaKam
50 shares
Patricia LaKam
50 shares
Cynthia Libowsky
50 shares
Harley Rubin
50 shares
TOTAL
452 shares
Milton Chernin is a nephew of Rae Shapiro. Issue No. 1 Gain on Sale of American Partition Corporation Stock On January 2, 1947, Shapiro, Rubin, LaKam, Libowsky, and Chernin purchased all the stock of two corporations known as American Partition Corporation (Wisconsin), and American Partition Corporation (New York). The number of shares acquired and the prices paid were as follows: Am. Partition
Am. Partition
(Wisc.)
(New York)
Shares
Price
Shares
Price
Shapiro
100
$4,000
20
$2,000
Rubin
50
2,000
20
2,000
LaKam
50
2,000
20
2,000
Libowsky
50
2,000
20
2,000
Chernin
50
2,000
20
2,000
On December 31, 1947, Chernin's stock in American Partition (Wisconsin) was sold to Beatrice Rubin, Lillian LaKam and Doris Libowsky, each acquiring 16 2/3 shares, and each paying $13,300. Beatrice Rubin purchased all of Chernin's 20 shares of stock in American *134 Partition (New York) for $17,100. On January 23, 1948, Shapiro as agent of all the stockholders, agreed in writing with Clinton Industries, Inc., a Delaware corporation, of St. Louis, Missouri, for the sale to it of all the outstanding stock of both the American Partition corporations for a consideration of $1,500,000. Of the price $100,000 was paid upon execution of the agreement, $1,300,000 was paid at the closing on March 9, 1948, and $100,000 was remitted by Clinton to O. H. Wibbing & Co., members of the St. Louis stock exchange, which credited $38,554.15 to the account of Shapiro, and $20,481.95 each to the accounts of Rubin, LaKam and Libowsky. Wibbing & Co. advised these individuals that pursuant to advice from Clinton these funds were held for purchasing stock of Clinton at a price of $30 per share or lower to be prorated 40 per cent to Shapiro and 20 per cent each to Rubin, LaKam and Libowsky. In March, Wibbing & Co. purchased 1,320 shares in the name of Shapiro and 660 shares each in the names of Rubin, LaKam and Libowsky for $97,975.69. The stock certificates and the cash balance of $2,024.35 were delivered by the brokers to the Northern Bank, Milwaukee, to be held in *135 escrow pursuant to paragraph 19 of the agreement with Clinton. Paragraph 19 of such agreement provided: "In order to secure the BUYER (Clinton) against SELLER'S (Shapiro's) obligation warranting that all liabilities are shown on the balance sheet of the Wisconsin Corporation, SELLER agrees that One Hundred Thousand Dollars ($100,000.00) of the purchase price, payable to him at the Initial Closing, shall be deposited in escrow with NORTHERN BANK, of Milwaukee, Wisconsin, to be held by it until a clearance from the Internal Revenue Department had been obtained and furnished to BUYER, and any additional tax liability in excess of that shown by the balance sheet shall have been discharged by the SELLER or the persons for whom he is acting. Said amount to be so deposited in escrow shall be deducted proportionately from the amounts payable to the several owners of stock whose stock is delivered at the Initial Closing." The Northern Bank on June 11, 1948, gave a receipt for the deposit in escrow, acknowledging receipt of: (1) Certificates for securities described in Exhibit "A" hereto attached, together with stockpowers sufficient to enable the undersigned to transfer by delivery *136 the shares represented by said certificates; and (2) Cash in the amount of $2,024.35. The receipt stated: "NORTHERN BANK agrees that it will hold the foregoing securities and cash in escrow to secure to Clinton Industries, Inc., the performance of the agreement of Michael Shapiro, Julius Rubin, Jack M. LaKam and Ben (also known as Bernard) Libowsky to obtain and furnish to Clinton Industries, Inc., from the Internal Revenue Department a clearance as to tax liabilities of American Partition Company (of Wisconsin) or the payment by them of any additional tax liability of said corporations in excess of that shown by the balance sheet mentioned in an agreement of January 23, 1948, and to secure the guarantee of collectibility of the accounts so guaranteed in said agreement, to American Partition Company and until said items have either been paid in full to American Partition Company or otherwise realized on by it in full through sale or settlement. Upon performance by them of their obligations to secure which said securities and cash are deposited as aforesaid, NORTHERN BANK will pay over to Michael Shapiro, Julius Rubin, Jack M. LaKam and Ben (also known as Bernard) Libowsky as *137 their respective interests may appear and as provided in said instrument dated March 9, 1948." In the year 1951 the conditions upon which the Northern Bank was to continue holding the Clinton Industries, Inc. stock certificates and cash pursuant to the agreement were fulfilled by a payment made in the amount of $2,678.29 to Clinton Industries, Inc. to cover additional Federal income taxes and interest in that amount in excess of the $175,000 reflected on the balance sheet of American Partition Corporation (Wisconsin). In the year 1951 a clearance from the Internal Revenue Service was then obtained as required by paragraph 19 and after such payment demand was made on Northern Bank to release the securities and money held in escrow pursuant to such agreement. The Northern Bank refused to acknowledge that the terms of the escrow had been fulfilled and an action was commenced in the Circuit Court of Milwaukee County, Wisconsin, on the 29th day of January 1952, for declaratory relief to have the court determine the rights and obligations of the parties with respect to the assets then in the escrow. Thereafter, pursuant to proceedings taken in such action, on March 14, 1952, the Circuit *138 Court entered its judgment decreeing that Rubin, Shapiro, Libowsky, and LaKam had completed and fulfilled the conditions of Section 19 of the escrow agreement. From the date of the purchase of the total of 3,300 shares of Clinton Industries, Inc. stock, Michael Shapiro, Julius Rubin, Ben Libowsky, and Jack LaKam each received personally the dividend payments on their respective holdings. On January 31, 1951, pursuant to an agreement entered into with National Container Corporation, Shapiro, Rubin, Libowsky, and LaKam assigned to National Container Corporation as additional security for the repayment of loans in the amount of $150,000 then made to them and to International Trading Co., their interest in the escrowed stock. On January 3, 1951, Chernin instituted a suit in the Circuit Court of Milwaukee County, Wisconsin, against Shapiro, LaKam, Rubin, and Libowsky and garnisheed their interests in the escrow. On December 31, 1951, the 3,300 shares of stock in Clinton Industries, Inc. held by the Northern Bank in the names of Shapiro, Rubin, LaKam, and Libowsky were sold by the escrow agent for the total amount of $84,723.46. By this time the market value had declined to $26 per share. *139 Of this amount, $80,000 was retained by the Northern Bank pursuant to the assignment to National Container Corporation, and by reason of the garnishment action and the balance of $4,723.46 was distributed as follows: Michael Shapiro
$1,889.39
Julius Rubin
944.69
Jack LaKam
944.69
Ben Libowsky
944.69
TOTAL
$4,723.46
At this time, the cash being held by the Northern Bank originally in this escrow account was distributed equally to Rubin, LaKam and Libowsky. Issue No. 2 Basis of Stock to Rubin, LaKam and Libowsky Rae Shapiro had operated a business as sole proprietor prior to 1939 collecting and baling waste paper, primarily beer cartons. Michael came into this business in 1939 or 1940. This business was enlarged to include making bungs for barrels and making bottle caps, and at one time employed about 200 people. This business was known as "Shapiro's". In 1946 a jeopardy assessment was made against Rae Shapiro for income taxes due the United States. During 1947 American Partition Corporation (Wisconsin) advanced money to Rae Shapiro, doing business as Shapiro's, and received merchandise which was credited against the advances. At the end of August 1947 *140 Rae owed this corporation a balance of $38,786.50. In September further advances were made and merchandise credited. During September 1947, the remaining assets of Rae's business were sold to American Partition (Wisconsin), with the consent of the Government, for $25,000 which was paid to the collector of internal revenue for credit against taxes. Subsequently further advances were made to Rae. Rubin, LaKam and Libowsky were officers of this corporation. At the end of 1947 and until March 9, 1948, the account receivable of Shapiro's on the books of American Partition (Wisconsin) showed a balance due from Shapiro's of $90,081.46. In the closing of the transfer of American Partition stock, Clinton required the payment of this account. On March 9, 1948, Rubin, LaKam and Libowsky each paid one-third of this amount to American Partition (Wisconsin) for which they received an assignment of the account receivable and the account was removed from the books of that corporation. Rae Shapiro never satisfied this account and no demand for payment was made upon her. Issue No. 3 Payment from Chernin Milton Chernin paid Michael Shapiro $4,750 by a check dated January, 30, 1948. The canceled *141 check bears the notation "repayment of loans". This was in repayment of a loan by Shapiro to Chernin. Issue No. 4 Attorneys' and Accounts' Fees Rae Shapiro filed returns for the years 1941 through 1944 including the income of the business she conducted under the name of "Shapiro's". The returns were investigated and in December 1946 the respondent determined deficiencies in tax and additions to tax for fraud. Rae Shapiro filed a petition with the Tax Court in March 1947 for a redetermination of her liabilities for those years, Docket No. 13221. A jeopardy assessment of a large amount was made. At some time prior to April 1950, the matter was referred to the Department of Justice for possible prosecution of both Rae and Michael Shapiro for fraud and in July 1950 in the United States District Court for the Eastern District of Wisconsin, Rae Shapiro and Michael Shapiro were indicted on two counts for attempting to defeat and evade a large part of the income tax due and owing by Rae Shapiro to the United States by filing false and fraudulent tax returns. The first count related to the year 1943, the second count to the year 1944. Both defendants pleaded "not guilty" to each count. *142 In November 1951, Michael Shapiro withdrew his plea as to the offense charged in the second count and entered a plea of nolo contendere. The Court adjudged Michael guilty on the second count, ordered the first count dismissed as to him, ordered the indictment dismissed as to Rae, and ordered the Probation Department to make a pre-sentence report. On January 7, 1952, the Court sentenced Michael to imprisonment for three years and to pay a fine of $10,000. The Tax Court case in Docket No. 13221 was settled in September 1955 by acceptance of an offer in compromise. In connection with this litigation Michael and Rae engaged the services of counsel and accountants for the ascertainment of their liability and for defense against the criminal charges. In December 1947, Michael signed a retainer agreement with Wm. B. Rubin, providing: "Mike Shapiro has retained Wm. B. Rubin as counsel for himself and his wife in the tax matters now pending in Washington D.C. This retainer is to include defense against any indictments that may be returned in the Federal Court against him and/or his wife. Michael Shapiro agrees to pay Wm. B. Rubin a retainer of $25,000.00. "In the event of a non-criminal *143 termination of the proceedings in Washington D.C., or in the event of an acquittal under an indictment, or a reversal or dismissal upon appeal, Shapiro is to pay Wm. B. Rubin an additional $50,000.00 for his services. "Shapiro also agrees that if Rubin employs additional office help, because of the time devoted to my above matter, he will add to the retainer an additional sum of $10,000.00, this sum is to be paid after May 1st, 1948, upon Rubin's direction." The services of Rubin were terminated prior to December 1948, and his claim for fees was settled in January 1949 by payment of $15,000. Of this amount $1,000 was for services in connection with other business matters. David Charness performed services in the civil case or on other business matters for the Shapiros. They paid him fees of $8,091.73 in 1948; $6,000 in 1949 and $250 in 1951. In 1947 the law firm of Gallagher, Osherman, Connor and Butler was retained to discuss with government representatives the criminal aspects involved in the filing of Rae Shapiro's income tax returns for 1941 to 1944 which resulted in the criminal case. The Shapiros paid this firm the amount of $798.45 in 1948 for such services. In 1948 *144 the firm of Paul, Weiss and Wharton was retained in connection with the tax case. This firm and its successors performed services in connection with both civil and criminal aspects of the case until June 1950. This firm represented Rae Shapiro only. The part of the fees paid this firm attributable to the criminal aspects is stipulated. The firm of Whyte, Hirschboeck and Minahan performed services in connection with both the civil and criminal aspects of the case and relating to both defendants. The fees paid this firm in 1948 and 1949 concerned only the civil aspects. Of the fees amounting to $13,908.52 paid this firm in 1950, three-fourths, or $10,431.39 related to the criminal aspects. Of the fees amounting to $6,654.44 paid in 1950, one-third, or $2,218.14 related to the criminal aspects. Half of these fees related to the case against Rae and half to the case against Michael. Of the fees paid in 1952, $1,784.07 related to civil aspects and $1,000 concerned the criminal case of Michael Shapiro alone. Gordon Bazelon, an attorney, was retained to determine if possible the sources of the accumulated income in the increased net worth. He performed services in 1948 and 1949, dealt *145 with both Rae and Michael Shapiro and discussed his findings with the accountants. He had no contact with other counsel involved in the case. He was paid fees amounting to $5,334.25 in 1949 and $1,000 in 1950. One-half of these amounts was in connection with the civil case, one-fourth related to the criminal case against Rae Shapiro, and one-fourth to the criminal case against Michael. Arthur Anderson and Company, an accounting firm, was retained to investigate the accounts of the business conducted as Shapiro's and reconstruct the income of that business from 1941 through 1947. Fees amounting to $22,375.50 paid in 1948 and $2,400 paid in 1949 were in connection with civil aspects of the case. Fees amounting to $11,652.60 were paid this firm in 1950 of which $4,915 related to the criminal aspects of the case, half to the case against Rae and half to the case against Michael. Fees amounting to $3,480 were paid this firm in 1951 of which $2,530 related to criminal aspects of the case, half of this to the case against Rae and half to the case against Michael. Fees amounting to $7,900 were paid to this firm in 1952. Of these amounts $1,375 related to accounting services in relation to *146 other matters, $3,525 related to the civil case and $3,000 related to the criminal aspects, one-half of this to the case against Rae and one-half to the case against Michael. The law firm of Margiotti and Casey was retained to represent Rae Shapiro in the criminal aspects of the case. This firm filed motions to dismiss the indictment and for a bill of particulars in conjunction with efforts of other counsel representing Michael in the case. This firm was paid $25,000 in 1950 in connection with the defense of the criminal proceeding against Rae Shapiro. The Shapiros paid the firm of Conley & Prieve $758.69 in 1950 and $660 in 1951 and paid Joseph Brazy $450 in 1950 and $120 in 1951 in connection with the civil case or other business matters. Michael Shapiro paid travel expenses of $955.64 in 1950 in the civil case or for other business matters. The firm of Lucas and Thomas performed services in the criminal case representing both defendants. This firm was paid $25,000 in 1951, half in connection with the case against each defendant. The Shapiros paid I. T. Cohen, an attorney, $5,000 in 1951 in the criminal case, half in connection with the case against each defendant. Nathan *147 Rakita was paid $100 in 1951 for services in the civil case or in other business matters. Michael Shapiro paid $2,750 to L. Goodsitt, attorney for other persons, in 1951. This payment was not an ordinary and necessary business expense of the petitioners. Michael Shapiro paid expenses of $2,028.52 in connection with the litigation. This was not an ordinary and necessary business expense of the petitioners. Richard Finn, an attorney, was retained in October 1951 by Michael and Rae Shapiro to represent them in the criminal case. Michael paid Finn $7,500 in 1951 for services in his behalf. After the indictment was dismissed as to Rae, she paid Finn $7,500 in 1951 for services in her case. In 1952 Michael paid Finn $4,000 for services in connection with the criminal case against him. The firm of Duerston & Lipton was retained by both Michael and Rae in 1950 to represent them particularly in the criminal case. Some services were related to the civil side of the case. Other services included preparation of a statement in mitigation of sentence. This firm was paid $12,187.20 in 1951 of which $3,000 related to the civil case, $3,712.06 to defense of the criminal case against Rae and *148 $5,475.14 to the criminal case against Michael. The firm was paid $1,820 in 1952, all of which was for services in the criminal case against Michael. The legal and accounting fees paid by the Shapiros are summarized below: Criminal case -
Civil case or other
defense of
Personal or un-
business expense
Rae
Michael
explained
In 1948
Paul, Weiss & Wharton
$ 7,397.11
500.00
Whyte, Hirschboeck & Minahan
4,779.45
David Charness
8,091.73
Gallagher, Osterman, Connor & But-
ler
399.23
399.22
A. Anderson & Co.
22,375.50
Post & Co.
39.25
McKersher & Link
90.58
For Wills & Trusts
215.00
In 1949
Randolph Paul
4,731.78
1,500.00
Whyte, Hirschboeck & Minahan
340.00
Wm. Rubin
1,000.00
7,000.00
7,000.00
David Charness
6,000.00
Gordon Bazelon
2,667.13
1,333.56
1,333.56
A. Anderson & Co.
2,400.00
In 1950
Paul, Weiss & Wharton
4,950.00
3,287.80
Whyte, Hirschboeck & Minahan
3,477.13
5,215.69
5,215.70
A. Anderson & Co.
6,737.60
2,457.50
2,457.50
Margiotti and Casey
25,000.00
Gordon Bazelon
500.00
250.00
250.00
Conley & Prieve
758.69
Joseph Brazy
450.00
Travel expenses of Michael Shapiro
955.64
In 1951
Paul, Weiss & Wharton
4.25
Whyte, Hirschboeck & Minahan
4,436.30
1,109.07
1,109.07
I.T. Cohen
2,500.00
2,500.00
Richard G. Finn
7,500.00
7,500.00
Lucas & Thomas
12,500.00
12,500.00
L. Goodsitt
2,750.00
Duerston & Lipton
3,000.00
3,712.06
5,475.14
Conley & Prieve
660.00
Joseph Brazy
120.00
David Charness
250.00
A. Anderson & Co.
950.00
1,265.00
1,265.00
Nathan Rakita
100.00
Expenses of M. Shapiro
2,028.52
Bond Costs - Chernin case
20.00
In 1952
Paul, Weiss & Wharton
1,000.00
Whyte, Hirschboeck & Minahan
1,784.07
1,000.00
Richard G. Finn
4,000.00
Duerston & Lipton
1,820.00
A. Anderson & Co.
3,525.00
1,500.00
1,500.00
1,375.00
*149 Issues No. 5 and No. 6 Beaver Lake Property In 1944 International purchased for $23,875.36 a property at Beaver Lake, Wisconsin, some 30 miles from Milwaukee. The buildings thereon were remodeled and new buildings erected making the property useable for summer residences and entertainment. The cost of additions and improvements prior to August 31, 1952, amounted to $344,953.62, including boating equipment $3,082.50, landscaping $42,564.66 and furniture and fixtures of $58,569.46. The property includes a large residence consisting of living room and dining room combination, three bedrooms, kitchen, bathroom, two wash rooms, and porch; a small house consisting of two bedrooms, living room, kitchen, and bathroom; one apartment located over a boat house, consisting of two bedrooms, living room, kitchen, breakfast room, and bath; one small dwelling house consisting of four bedrooms, two baths, kitchen, which has attached to it a community entertainment room with complete facilities for entertaining large groups; and at a lower level of that house there are contained several dressing rooms with showers for guests and a rest room; a guest house capable of accommodating six people; a *150 horse stable with caretaker's loft above; a boat house; a rock garden; a playground; a floodlighted tennis court; and a small screen house. The large house was occupied by Michael Shapiro and his wife for about three months during each summer in 1950, 1951 and 1952. The small house was occupied by Jack LaKam and his family consisting of his wife and two small children during the years 1950, 1951 and 1952 for periods of about nine or ten weeks. The apartment above the boat house was occupied by Ben Libowsky and his family consisting of his wife and three small children during the years 1950, 1951 and 1952 for similar periods. The small dwelling house was occupied for similar periods by Julius Rubin and his family consisting of his wife and two small children during the years 1950 and 1951, and three children during the year 1952. In the years 1950, 1951 and 1952 when the respective premises were occupied by the above named individuals and their families, they paid the following as rental to International Trading Co.: Michael Shapiro paid $3,600; Julius Rubin $2,400; Jack LaKam $1,200; and Ben Libowsky $1,200. The fair rental values of such premises for a three-month summer period *151 were not in excess of the amounts paid. During its fiscal years ended August 31, 1951, 1952 and 1953, petitioner International Trading Co. incurred the following expenses for the upkeep and maintenance of the Beaver Lake property; in addition to interest expenses and taxes: Year Ended
Year Ended
Year Ended
Item
8/31/51
8/31/52
8/31/53
Caretaker salaries
$ 3,609.85
$ 4,270.54
$ 7,395.09
Repairs and Maintenance
6,184.30
5,813.91
5,114.79
Insurance
1,500.00
1,500.00
2,000.00
Light and Heat
3,000.00
3,000.00
3,000.00
Stable supplies
635.51
717.40
TOTALS
$14,294.15
$15,219.96
$18,227.28
International Trading Co.'s merchandise sales for the years ended August 31, 1951, 1952 and 1953 amounted to $362,919.73, $17,834.51 and $1,615.13, respectively. It also operated as a commission agent for National Container Corporation, New York, New York in selling paper cartons and containers primarily to local breweries. Issue No. 7 Gain on Sale of Real Estate In 1951 LaKam, Rubin and Libowsky together acquired a one-third interest in certain unimproved real estate near 78th or 79th Street and Cicero Avenue in Chicago. The property was in *152 a commercial area and was some 10 or 12 blocks distant from a Ford plant. These three petitioners had substantial investments in other real estate at that time but did not hold themselves out as in the real estate business. A part of this property was sold in 1952 as a parcel and a profit was realized. The sale was prompted by the desire of the owners of the other interests to dispose of the property. Opinion Issue No. 1 Gain on Sale of American Partition Stock In 1948 Shapiro and his sons-in-law sold to Clinton all the stock of the two American Partition corporations. The price was $1,500,000 and the agreement provided for the deposit of $100,000 of this with Northern Bank in escrow to be held until clearance was obtained for Federal tax liability of American Partition Corporation (Wisconsin). This deposit was not released to the petitioners until 1951. They contend that this deposit was not includible in their incomes in 1948 since it was not received by them until the escrow conditions were satisfied and that this did not occur until after that year. The respondent contends that this sum was received by the sellers in 1948 through the purchase of stock in Clinton on which *153 they received dividends and only a small amount of cash was placed in escrow, hence the sellers are taxable on the gain on the full amount of the selling price, since the full amount was received for their benefit in 1948. The respondent argues that the buyer had parted with the entire consideration, and the sellers consented to the deposit of a part of it to protect the buyer from claims which might be made for taxes or uncollectible accounts receivable, and that the economic benefits of this property inured to the petitioners, citing Scott P. Myers, 30 B.T.A. 44 (1934), Federal Development Co., 18 B.T.A. 971 (1930) and Luther Bonham, 33 B.T.A. 1100 (1936) affd. 89 Fed. (2d) 725 (C.A. 8, 1937). In Goetzke Gasket & Packing Co., 24 T.C. 249 (1955) Acquiescense, 1956- 1 C.B. 4, the purchasing corporation withheld for three years delivery of a part of the purchase price in the form of 1,000 shares of its stock to guard against loss from breach of warranties. We found that the right to these shares had no ascertainable fair market value to the purchasers in the year of the sale and was not includible *154 in the amount realized in that year, notwithstanding that the equivalent of dividends was paid to the purchasers on the stock while it was withheld. In Marion H. McArdle, 11 T.C. 961 (1948) Acquiescense, 1949- 1 C.B. 3, the sellers were required by the contract to return a part of the purchase price to the buyer to safeguard it against loss and subsequently received less than the amount so returned. We held that such part was not received as income at the time of the sale. See also Preston R. Bassett, 33 B.T.A. 182 (1935) affd. 90 Fed. (2d) 1004 (C.A. 2, 1937) and Commissioner v. Cleveland Trinidad Paving Co., 62 Fed. (2d) 85 (C.A. 6, 1932) affirming 20 B.T.A. 772 (1930). Here the fund deposited in escrow was not in the possession or control of the petitioners during 1948 nor could they know in that year how much of it they would eventually receive. Their right to it was subject to a substantial contingency. The petitioners were not required to include any value of the right to the fund in the amount realized as gain in 1948. Issue No. 2 Basis of Stock to Rubin, LaKam and Libowsky In reporting *155 their 1948 income, Rubin, LaKam and Libowsky increased the basis of their stock in American Partition (Wisconsin) by the $30,027.15 each had contributed to make good the account receivable of Rae Shapiro, doing business as Shapiro's, to that corporation. They contend that this account was worthless and is an addition to their basis or else is deductible as a bad debt. As sellers they were required to make good the balance sheet of that company in the settlement. The respondent points out that these petitioners, as officers of the corporation, had advanced corporate funds to Rae Shapiro in 1947 after the jeopardy assessment had been made against her, and had continued to advance funds after September 1947, when the corporation purchased all the assets of her business and contends that they never intended to collect the account and never demanded payment, nor has there been a showing that the account was uncollectible. Further, that Rae Shapiro paid out many thousands of dollars in attorneys' fees in later years and committed no act of bankruptcy, hence this is not a true bad debt and not a proper addition to basis. In the contract for the sale of the Partition stock to Clinton the *156 sellers had guaranteed the balance sheets of the corporations. When the purchaser required the stockholders to make good this account receivable, these stockholders, in effect, received less for their stock. The form of the transaction was that they purchased the account, but this was in form only. It has been stipulated that the attorneys' fees paid by Rae Shapiro in the years 1948 to 1952 were paid from money advanced to her by Michael for this purpose. We do not doubt that Rubin, LaKam and Libowsky did not expect to enforce collection of this account. In many cases we have held that money advanced to a corporation without expectation of collection was not deductible as a bad debt but was a contribution to capital. That is the substance of this transaction. These stockholders contributed these amounts to the corporation and are entitled to increase their bases accordingly. Issue No. 3 International Trading Co. - Chernin Commission In 1948 Michael Shapiro received $4,750 from Milton Chernin. This was not included as income in the Shapiros' tax return for 1948. The respondent determined *157 that it was includible in income as being a commission paid by Chernin for handling the stock transactions whereby Chernin's stock was transferred to Shapiro's daughters for $57,000 in cash. The check was dated January 30, 1948, and bears the notation "repayment of loans". Shapiro said the check was in repayment of money originally loaned Chernin to buy the stock. Chernin denied that he owed money to Shapiro at that time. From the evidence we have found that the check was given in repayment of a loan. We sustain the petitioners on this issue. Issue No. 4 Attorneys' and Accountants' Fees In the taxable years 1948 through 1952, Michael and Rae Shapiro paid substantial amounts for fees of attorneys and accountants incurred in connection with litigation over their tax liabilities, particularly the liability of Rae Shapiro for taxes on income from the business operated as "Shapiro's" in the years 1941 through 1944. There was a case before the Tax Court originating in 1947 and settled by a compromise in 1955 and a criminal indictment of Michael and Rae filed in July 1950 which was dismissed as to Rae in November 1951 and under which Michael was convicted on one of two counts and sentenced *158 in January 1952. The services involved efforts to determine the extent of the tax liability, negotiations with representatives of the Internal Revenue Service and Department of Justice and services in connection with the trial and a hearing on probation of Michael. The Shapiros claimed deductions for most of the fees. The respondent allowed some as deductions and disallowed others. The respondent agrees that fees expended in the civil cases are deductible but does not agree as to the amounts claimed therefor in this case and contends that as a matter of public policy fees in connection with the defense of the criminal case are not allowable as deductions. The respondent also contends that the litigation arose over the filing of personal income tax returns and hence the fees could not be regarded as business expenses. But the evidence shows that the income reported on the returns or involved in the dispute came from a business operated as a sole proprietorship. Necessarily the profits of such a business had to be reported on individual returns or joint returns of husband and wife. The litigation concerned business income and the costs of such litigation are business expenses and are *159 deductible except where a conviction results and public policy denies the deduction. We have held that legal expenses paid in connection with attempts to determine and settle income tax liabilities are deductible, James A. Connelly, 6 T.C. 744 (1946) Acquiescence, 1951- 1 C.B. 2; Regulations 111, section 29.23(a)-15, and this rule applies in cases where a criminal fraud penalty is also compromised, Greene Motor Co., 5 T.C. 314 (1945) Acquiescence, 1945 C.B. 3. Where the services have no connection with the criminal case the expenses are deductible even though subsequent to the services the taxpayer is indicted for criminal fraud, Hymie Schwartz, et ux., 22 T.C. 717 (1954) affd. 232 Fed. (2d) 94 (C.A. 5, 1956). Where there is an indictment, but the prosecution is ended without a conviction the presumption must prevail that the defendant is not guilty and the costs of the defense are deductible. Morgan S. Kaufman, 12 T.C. 1114 (1949) Acquiescense, 1949- 2 C.B. 2. On the other hand we have held *160 in a number of cases that legal expenses incurred in the unsuccessful defense of a criminal prosecution are not deductible. Thomas A. Joseph, et ux., 26 T.C. 562 (1956) and cases there cited. Applying these principles to the facts in the present case, the fees paid for services in the determination of income tax liabilities other than in the criminal case are deductible as well as fees paid for services in the defense of Rae Shapiro which resulted in the dismissal of the indictment against her, while fees paid for services in the unsuccessful defense of Michael, who was convicted, are not deductible. Although the petitioners contend that half of these fees should be deductible since the defendant was convicted on one of two counts and the other was dismissed, we find no merit in this argument. To some extent the parties have stipulated the fees paid in connection with the criminal aspects of the case. Where not stipulated we have found from the evidence the amounts allowable and amounts not allowable as deductions. Where the evidence is insufficient to establish the nature of the services we have disallowed the deduction, since the burden of proof is upon the taxpayers. *161 However, where an allocation is indicated and is practicable we have made the allocation. The net effect can be determined in the necessary recomputation under Rule 50. In the summary of fees stated in our Findings of Fact, the amounts shown in the columns headed "Civil case or other business expense" and "Criminal case - defense of Rae" are deductible; the amounts shown under "Criminal case - defense of Michael" and "Personal or unexplained" are not deductible. Issue No. 5 International Trading Co. - Beaver Lake Property The respondent disallowed deductions claimed by International for depreciation and maintenance expenses of the property at Beaver Lake. The petitioners contend that such items are ordinary and necessary business expenses. They say that the Beaver Lake property was bought in 1944 with the intent of establishing a place for the entertainment of customers of International and the other businesses in which the Shapiro family was interested. The place was remodeled and new buildings were erected. The several corporations concerned had sales of three to four million dollars in 1948. After the sale of the Partition corporations in 1949 the sales of other companies exceeded *162 two million dollars. They say the property was used extensively for entertainment of up to 150 people at times and the other corporations paid amounts to International as their shares of the expense of such entertainment. Shapiro testified that in 1950, 1951 and 1952 smaller groups were entertained consisting of special customers, suppliers and acquaintances in the business world. Efforts to sell the property in 1950 and thereafter were unsuccessful in the fiscal years involved. The corporation received rental income from the property. Although it may have been used at times for entertaining, this property was maintained in the taxable years ending in 1951, 1952 and 1953 primarily for the personal benefit of the stockholders and had little or no business use. There is no convincing evidence that in the taxable years of the corporation any substantial number of customers or representatives of customers were entertained there. The major customer of International was Schlitz Brewing Co. and none of its officials or purchasing staff were entertained at Beaver Lake. In the taxable years ended in 1952 and 1953 the sales of International were less than the costs of maintaining this property. *163 The corporation paid some $23,000 for the property and spent some $344,000 to furnish it as a summer home for the Shapiros, their daughters and their families. These people made use of the property. Hence no deduction is allowable to the corporation for depreciation thereon or expenses of its maintenance. Louis Greenspon, 23 T.C. 138 (1954) affd. on this point 229 Fed. (2d) 947 (C.A. 8, 1956). Issue No. 6 Rental Value of Beaver Lake Property as Income to Stockholders The respondent determined that the individual petitioners realized income in the nature of dividends from International from the use as a summer home of the Beaver Lake property owned by International, and that such income should be measured by the expenses paid by the corporation in maintaining the property plus the depreciation claimed upon it, plus the fair rental value to the petitioners of the use of the premises, citing Louis Greenspon, supra, and Ned Wayburn, 32 B.T.A. 813 (1935). The totals are allocated 3/7 to the Shapiros, 2/7 to the Rubins and 1/7 each to the LaKams and the Libowskys, the ratios used by the petitioners in determining the amounts to *164 be paid International for use of the property. The respondent says the rental value was $11,475 per year, and by adding the other expenses shown in the Findings of Fact, a figure of from $25,000 to $30,000 per year is reached to be allocated among the petitioners. On this basis it was determined that the Shapiros, for example, who had already paid $3,600 per year for summertime use of a part of the premises, had received additional income of $7,400 to $9,000 in each of the taxable years 1950 to 1952, by reason of such use. The Shapiros occupied a part of the premises for about three months each summer. The other families stayed about nine or ten weeks. The Shapiros thus paid $1,200 per month for their use. The respondent would charge them with receiving a value of about $4,000 per month for their occupancy. International attempted to sell the property in 1950 and listed it for sale in the summer of 1951, for $200,000. An offer of $105,000, was received but was rejected. A part of the expense of maintaining the property by the corporation, as owner, was necessary even if the petitioners had never occupied it, such as salary of caretaker, taxes, insurance, repairs, and maintenance. *165 We have found that under the circumstances described the fair rental values of the premises for the time these families made use of the property were not in excess of the rentals they paid. We conclude that they received no additional income by reason of their use of the corporation's property. Issue No. 7 Gain on Sale of Real Property The respondent determined that LaKam, Rubin and Libowsky received ordinary income and not capital gains from the sale in 1952 of property on Cicero Avenue in Chicago. These petitioners held a one-third interest and their co-owners handled the sale. The respondent argues that the acts of the joint ventures are attributable to the petitioners, citing Morris W. and Sarah Zack, 25 T.C. 676 (1956) affd. 245 Fed. (2d) 235 (C.A. 6, 1957) certiorari denied 355 U.S. 823, and that the co-owners held the property for sale to customers in the ordinary course of business. LaKam, Rubin and Libowsky testified that they were not brokers or in the real estate business, that they were developers of commercial property for investment purposes, that the property in question was held for development and was sold when the *166 co-owners who held a two-thirds interest refused to go along with any development. They testified that the property was not held primarily for sale. There is no evidence to the contrary and we sustain the petitioners. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Jack and Lillian LaKam, Docket Nos. 57349, 63563; Bernard and Doris Libowsky, Docket Nos. 57350, 63562; Julius and Beatrice Rubin, Docket Nos. 57351, 63561; and Michael and Rae Shapiro, Docket Nos. 57352, 63560.↩