AMERICAN INSULATION CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent American Insulation Corp. v. Commissioner
Docket Nos. 14698-82, 14884-82, 14885-82.
United States Tax Court
T.C. Memo 1985-436; 1985 Tax Ct. Memo LEXIS 195; 50 T.C.M. (CCH) 850; T.C.M. (RIA) 85436; August 20, 1985. Harvey R. Poe and Carey Gage, for the petitioners. Richard J. Sapinski and Meryl Fuchs-Goldberg, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax in these consolidated cases: Addition to Tax
Docket No.
Petitioners
Year
Deficiency
Section 6653(b) [2]
14698-82 [3]
American Insulation
1973
$1,579
Corporation
1974
6,231
1975
$12,688
6,785
14884-82
Frank Cikutovich
1974
3,607
1,804
and Josephine
1975
18,149
9,075
Cikutovich [4]
14885-82
Canio Saluzzi
1973
2,894
1,447
and Joan Saluzzi [4]
1974
9,016
4,508
1975
4,813
2,407
*199 In his amendments to answers, respondent asserted increased deficiencies in taxes and additions to tax as follows: Increase in
Increase in
Addiditon to Tax
Docket No.
Petitioners
Year
Deficiency
Section 6653(b)
14698-82 [3]
American Insulation
1973
$454.00
Corporation [5]
1975
$ [6] 1,456.00
287.00
14885-82
Canio Saluzzi and
1973
139.76
69.88
Joan Saluzzi [7]
1975
583.35
291.18
After concessions, the issues remaining for decision are: (1) Whether any of the expenditures made by American Insulation Corporation during 1973 through 1975 resulted in the constructive distribution of dividends to shareholders Frank Cikutovich and Canio Saluzzi; (2) whether certain expenses and items of depreciation were properly deducted by American Insulation Corporation during the years 1973 through 1975 as business expenses, namely: (a) items relating to home entertainment expenses; (b) items relating to home office expenses; (c) expenses related to the garage and driveway at the Saluzzi residence; (d) a 1974 bad debt deduction; and (e) alleged on-site cash payments or "tips" given to facilitate business; (3) *200 whether all or part of the underpayments of tax due from the petitioners for each of the years at issue was due to fraud; and (4) whether assessment of the deficiencies due from the petitioners is barred by the statute of limitations. *201 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner American Insulation Corporation (AIC) was a New Jersey corporation with a principal place of business in Paramus, New Jersey, at the time its petition was filed with this Court. [8] All other petitioners also resided in the State of New Jersey when their petitions were filed. Petitioners Frank Cikutovich (Cikutovich) and Josephine Cikutovich are husband and wife and filed joint Federal income tax returns for the calendar years 1974 and 1975. Petitioners Canio Saluzzi (Saluzzi) and Joan Saluzzi are husband and wife and filed joint Federal income tax returns for the calendar years 1973 through 1975. Prior to and during 1973 through 1975, AIC was engaged in the business of providing and installing insulation in new construction. During the years at issue, AIC was a subcontractor on the Bowline #2 power plant project (the Bowline project) for Orange & Rockland Utilities in Haverstraw, New York. The general contractor of the project, Bechtel Corporation (Bechtel), hired AIC to insulate the piping *202 used in the Bowline project. During phase one of this two-phase project, AIC nearly went bankrupt. The job was bigger than expected and AIC incurred substantial liability for payroll, withholding taxes, fringe benefits and supply costs. For phase II, a new arrangement was negotiated with Bechtel so that payment for work completed would be received early in that phase enabling AIC to pay off its overduc liability resulting from phase one. AIC agreed to provide closer supervision in an effort to eliminate the labor problems that had occurred during phase one. Saluzzi personally handled this additional supervision. In phase two of this project more problems arose. It was, however, imperative for AIC to make phase two a financial success in order to recoup the liabilities generated from phase one. After erecting scaffolding, the asbestos workers went on strike. Since other tradesmen, who were not on strike, continued to work at the job site, AIC had a major interest in retaining their preparatory work in place and to prevent the work of other tradesmen from progressing to an extent that would increase the difficulty of insulation installation at a later date. Additionally, the *203 supply of calcium silicate dried up and AIC was forced to obtain the material from Atlas Asbestos (Atlas) in Canada. Supply material was delivered by Atlas' trucks and drivers. Delivery was again delayed because Atlas' drivers were nonunion members and as such were not allowed by the teamster union shop steward to enter the project gate. Saluzzi was instructed by the union that either a teamster had to drive the truck onto the job site or a teamster had to ride with the driver to the job site. To cope with this problem the first time it arose, AIC hired a teamster on a daily basis. Thereafter, Saluzzi worked out an arrangement with union officials. From February 1967 until April 29, 1976, Matthew Balich (Balich) owned four-sevenths of the outstanding shares of AIC stock. Balich is an insulation contractor and was paid consulting fees by AIC from 1970 through 1975. Although Balich was the majority shareholder, he was not active in the corporate business during the years at issue. The remaining three-sevenths of the stock was held by Cikutovich, Saluzzi and Thomas Cikutovich, each owning a one-seventh share. [9] During 1973 through 1975, Cikutovich and Saluzzi were employed *204 by AIC as its president and vice president, respectively. Thomas Cikutovich, the brother of Frank Cikutovich, was employed by AIC as a mechanic and listed as the corporate secretary-treasurer during 1971 through 1973, although he was not active in the management of AIC. Cikutovich and Saluzzi were the only corporate officers authorized to sign checks on behalf of AIC. Only one signature of either officer was required to issue a corporate check. Cikutovich and Saluzzi were known to AIC customers as the owners of the corporation and were in charge of all phases of AIC operations. Balich was not an officer of AIC and received only consulting fees, not a salary. Meetings of AIC shareholders and Board of Directors were frequently conducted without Balich. For the years 1971 through 1975, AIC paid Cikutovich and Saluzzi the following salaries: 1971
1972
1973
1974
1975
Cikutovich
$15,275
$18,200
$33,800
$40,300
$46,050
Saluzzi
15,275
18,200
34,175
40,300
46,050
*205 In February 1975, Balich advised the other shareholders and AIC of his desire to terminate his interest in AIC and, thus, negotiations began concerning the retirement of his shares. Ultimately, terms of sale were agreed upon and the shares owned by Balich were retired. Thereafter, the stock of AIC was owned in equal one-third shares by Cikutovich, Saluzzi, and Thomas Cikutovich. From 1973 through 1975, Daniel Pyda (Pyda) was employed as the principal AIC bookkeeper and was in charge of posting entries in the cash disbursements journal and general ledger of AIC. It was the procedure at AIC for the bookkeeper to make such postings based on oral instructions, rather than on written posting instructions, journal entry forms, or other similar written directions. Among the items posted by Pyda pursuant to the oral instructions of either Cikutovich or Saluzzi were many of the items disallowed to AIC in the statutory notice. The corporate income tax returns of AIC for the years 1973 through 1975 and the individual income tax returns for Cikutovich and Saluzzi for the years 1973 through 1975 were prepared by Stanley Greenberg, a certified public accountant with the Springfield, New *206 Jersey partnership known as Lerman & Greenberg, Certified Public Accountants. The corporate returns of AIC were prepared based on the books and records provided to Greenberg by AIC. At the time Greenberg received the corporate books, postings had been made to the general ledger and a trial balance was computed. Greenberg made adjustments for items such as depreciation and payroll taxes from the books and records AIC provided to him, but did not perform a certified audit of AIC. Cikutovich Residence
During 1973 and 1974, AIC made payments towards the purchase of home furnishings from the Hackensack, New Jersey branch of Huffman-Koos, a home furnishings store. The following items, paid for, at least in part, by AIC, were delivered to and used in the home of Frank and Josephine Cikutovich: Invoice
Invoice Cost
Check Drawn
Check
Number
to AIC
by AIC
Year
Number
Etagere
046008
$ 304.50
$ 304.40
1973
2324
Sofa, Loveseat,
and arm covers
096192
1,098.75
950.00
1974
3226
2 chairs and
arm cushions
096197
561.15
451.15
1974
3433
2 lamps and 2
shades
099091
409.50
369.50
1974
3593
Draperies and
related hardware
100688
1,056.41
885.00
1974
3360
Mirror
155312
136.45
136.45
1974
$3,566.76
$3,096.50
*207 The amounts indicated above as drawn by AIC were charged on the cash disbursements records of AIC as "direct job expenses," and were deducted on the corporate returns for 1973 and 1974. [10]
The sale of the sofa, loveseat, and arm covers was written up by Huffman-Koos on invoice number 096192. The invoice indicated the stock numbers, color, sizes, and quantities of items purchased, the discount amount, sales tax, deposit paid and balance due. Cikutovich altered and rewrote this invoice, removing references to the color, and type of furniture. The invoice as altered indicated a purchase of 90 scaffolding support brackets at $10 each and one scaffolding pin at $2.50, allegedly totaling $950, after tax. The altered invoice indicated that the merchandise was a direct cost to the Bowline project, that it was to be delivered to the Bowline project in Haverstraw, New York, *208 and that AIC check number 3226 was drawn to cover this amount. Similarly, invoice number 096197 in its original form indicated that two chairs and two pairs of arm covers were purchased for $668, less a 20 percent discount of $133.60, plus sales tax of $26.75 for a total of $561.15. A cash deposit of $110 was paid on this amount, according to the original invoice, yielding an outstanding balance of $451.15. As altered, the "customer's copy" of this invoice indicated that 84 scaffolding support brackets and one Allen wrench were purchased for $840.75, plus $44.25 tax, for a total of $885. The altered invoice allocated the costs to the Bowline project and indicated that check number 3360 rather than check number 3433 was drawn to cover this amount. The time of alteration is unknown. Also, an invoice on a different form from that issued by Huffman-Koos was fabricated which indicated the purchase of 42 angle support scaffolding brackets and 7 angle support pins from Huffman-Koos for a total of $451.15. This invoice charged the expenses to the Bowline project and indicated that AIC check number 3433 was drawn to cover this expense. Invoice number 099091 reflected the purchase *209 of two lamps and two shades on which a partial payment of $40 had been made, leaving a balance due of $369.50. A rewritten invoice on a form different from that issued by Huffman-Koos indicated that $369.50 was expended by AIC for the purchase from Huffman-Koos of 35 scaffolding angle support brackets and one scaffolding support pin. Again, the invoice indicated that these items were delivered to the Bowline project, and paid by AIC check number 3593. During the years 1974 and 1975, AIC made payments towards the purchase of home furnishings from Bograd Brothers of Paterson, New Jersey, which were delivered to and used in the home of petitioners Frank and Josephine Cikutovich. The following items were acquired by Frank and Josephine Cikutovich from Bograd Brothers: Invoice
Date of
Invoice
Item
Number
Purchase
Cost
72" stereo credenza
speakers, player,
and amplifier
N7935/93733
1-31-74
1,365.00
2 curio cabinets [11]
N8159/97340
3-01-74
501.90
30" X 48" oval
cocktail table
N008443/94893
5-03-74
603.75
Table
94560
7-18-74
208.95
Bedroom furniture
N010728/99334
9-05-75
3,911.25
2 mattresses; 2
box springs
97792
9-12-75
462.00
$7,052.85
*210 During 1974 and 1975, AIC drew the following corporate checks to Bograd Brothers towards the purchase of the above items: Check Number
Date of Check
Amount
3158
1-30-74
$ 993.30
3418
3-01-74
609.00
3533
3-20-74
264.60
3753
4-19-74
770.00
6806
9-05-75
850.00
Total
$3,486.90
Amounts corresponding to the amounts on the checks listed above were credited to the Cikutovich customer account at Bograd Brothers shortly after the checks were drawn. Bograd Brothers sells home furnishings, not office furniture. AIC did not purchase office furnishings from Bograd Brothers and did not have a customer account with that store. However, according to AIC files, invoices from Bograd Brothers were filled out reflecting the following AIC corporate expenditures: Date of Invoice
Items
Total Amount
1-30-74
Desk blotter frame, office
$ 993.30
chairs, tables, filing
cabinet, clothes racks
3-01-74
Swivel chairs, filing cabinet,
609.00
office desks, desk lamps,
office chairs
3-20-74
Filing cabinets
264.60
4-19-74
Office chairs, conference
770.00
chair, filing cabinet,
office desk, table
9-05-75
Clothing racks, office chairs,
850.00
filing cabinet, table,
office desk
Total
$3,486.90
*211 The Huffman-Koos and Bograd Brothers invoices indicating AIC corporate expenditures were filled out by Cikutovich. The Bograd Brothers invoices were actually blank customer worksheets that Cikutovich took from the Bograd Brothers store, filled in to reflect the above-mentioned purchases, and placed in the files of AIC. The checks drawn by AIC in 1974 to Bograd Brothers, like the checks to Huffman-Koos, were charged to AIC account number 501.9 as "direct job expenses." These amounts were deducted on the 1974 corporate return of AIC as "direct job costs." [12] The check dated September 5, 1975, was posted on account number 144 as "office furnishings and equipment," and a depreciation deduction of $42.50 was claimed for the purchase on the 1975 AIC corporate return. On or about October 11, 1975, Cikutovich purchased a player piano and accessories from Duffy Player *212 Piano Co., Palisades Park, New Jersey, for $2,094.75. The piano and accessories were delivered to and used in Cikutovich's home. On October 14, 1975, AIC issued a check payable to Duffy Piano Co. in the amount of $425 as part payment for the piano. This check was charged in the cash disbursements records of AIC to account number 500 as "purchases-materials," and was deducted on AIC's 1975 corporate return as part of its "purchase expense." [13]
During 1974, Cikutovich had Raymond Wells, an architect, draft plans for an addition to his home. The final revision of these plans shows an addition of two bedrooms in the second floor center portion of the Cikutovich residence as well as an addition of a family room with fireplace and bookshelves at the rear of the first floor. Wells charged Cikutovich $175 for his drafting work and issued him a bill dated January 6, 1975 for this amount. On January 9, 1975, AIC issued a check for $175 payable to Raymond R. Wells. The check was charged on the cash disbursements *213 records of AIC to account number 601.13 as "legal and professional services," and was accordingly deducted on the 1975 corporate return of AIC. [14]
On May 13, 1973, Cikutovich applied to the Borough of Paramus Department of Buildings for a permit to construct an addition to his residence as reflected in the plans drafted by Wells. On May 19, 1975, he was granted a building permit for the purpose of constructing additional bedrooms. On May 16, 1975, AIC issued a check for $61 payable to the Borough of Paramus for the issuance of this permit. This check was charged to AIC account number 501.3 as "subcontract costs," and was accordingly deducted on the 1975 corporate return of AIC. [15]
During 1975, Cikutovich engaged a building contractor, Joseph Luppino, to construct the addition *214 to his house. The March 22, 1975 and June 1, 1975 work proposals submitted by Luppino to petitioners Cikutovich show that the cost of the work was estimated at $21,800. The cost of the work performed by Luppino, however, was $26,130, and Luppino was paid an additional $1,070 for future services to be rendered at Cikutovich's residence. Luppino constructed both the upstairs addition consisting of two bedrooms and a bath, and the lower floor addition, which expanded an existing room. The entire $27,200 amount charged by Luppino was paid by AIC in nine checks dated from July 14, 1975 to November 7, 1975. Each check was charged in AIC records to account number 501.3 under the heading "subcontracting," and was deducted on the AIC corporate tax return for 1975. [16]
During 1973, Cikutovich purchased shrubbery and trees from Eisele's Nursery and Garden Center (Eisele's) in Paramus, New Jersey. These plants were delivered to and planted at the Cikutovich home at a total cost from Eisele's *215 of $710.90. AIC issued checks during 1973 that were payable to Eisele's in various amounts totaling $655, which were applied towards the above purchases. Additionally, AIC issued another check dated April 6, 1973, payable to Eisele's in the amount of $265 for the purchase of other merchandise used at the Cikutovich home. These AIC checks in the above amounts totaling $920 were charged on the corporate cash disbursements records to account number 501.9 as "direct job expenses," and were deducted on the AIC's 1973 corporate tax return. [17] At least part of these expenses were categorized as direct job expenses of the Bowline project, although none of the goods supplied by Eisele's were used for that project. During 1973 and 1975, AIC made payments towards the purchase of patio and home furnishings from Scibetta Brothers of Little Ferry, New Jersey, for use at Cikutovich's residence. The items were purchased at an invoice cost of $2,229.84 and the payments were made as follows: Invoice #
Date
Description
Invoice Cost
24528
3/24/73
Lawn Chairs, Tables
$ 485.00
and Ornaments
24567
3/28/73
Sales Tax on Invoice
33.75
No. 24528
24583
3/31/73
Tea Cart, Chairs and
229.90
Table
24584
3/31/73
Standing Ashtray and
87.97
Ice Bucket
25640
6/8/73
Glasses
15.75
25650
6/9/73
Ashtrays, Flower Stand,
240.71
Patio Liter, Umbrella
26965
8/13/73
Umbrella Repair
31.76
A32175
10/21/75
Fireplace Screen and Tools
355.00
A32177
10/21/75
Dining Room Table and
750.00
Four Chairs
$2,229.84
*216 During 1973 [18] and 1975 AIC drew the following corporate checks to Scibetta Brothers toward the payment of the invoices referred to above: Check #
Date
Amount
1110
3/23/73
$ 485.00
1159
3/30/73
220.00
1660
6/8/73
240.00
2033
8/10/73
31.44
7059
10/21/75
355.00
7117
11/1/75
350.00
7281
11/25/75
337.50
$2,018.94
The payments, drawn on AIC corporate account and charged to account number 502.9 as "warehouse expenses" in its cash disbursements records, were deducted on the 1973 and 1975 corporate tax returns. During 1975, AIC paid for the purchase of flooring for the Cikutovich's home from Floors Beautiful by two checks totaling $1,100 which were charged on its cash disbursements records to account number 146 as "office improvements." The flooring expenses were capitalized and a depreciation deduction of $55 was claimed with respect to such expenses on AIC's 1975 corporate tax return. [19]
*217 In 1974, AIC paid $600 to purchase a grave site in George Washington Memorial Park, Paramus, New Jersey for petitioner Cikutovich. This payment was deducted in 1974 by AIC as miscellaneous expense. During 1975, Cikutovich purchased roundtrip air transportation from New York to Zadar, Yugoslavia, for his mother and son. The tickets cost $778 and were purchased through Kucer Travel, Inc. of New York, New York. Kucer Travel, Inc. was paid by AIC with two checks totaling $778. The checks were charged on AIC cash disbursements records to account number 601.23 as "travel and subsisitence" expenses and were deducted on AIC's 1975 corporate tax return. [20]
Saluzzi Residence
During 1973, AIC paid Garden State Door Sales $952.50 by two checks for the purchase and installation of an automatic garage door at the home of Saluzzi in Old Tappan, New Jersey along with radio controls for "two cars." AIC charged the checks on its cash disbursements records to account number 501.3 as "subcontract costs." This expense was deducted on AIC's 1973 corporate tax return. During 1974, AIC paid for lawn care services rendered by *218 Tech Turf, Inc. at Saluzzi's home with two checks in the total amount of $449.30. One of these checks was charged to AIC account number 502.9 as a "warehouse expense," while the other was charged to account number 601.2 for "office maintenance." Both items were deducted on the 1974 AIC corporate tax return. AIC made payments of $378.75 and $3,016.60 (totaling $3,395.35) during 1974 and 1975, respectively to Walter Arnemann, Saluzzi's landscaper, for lawn and yard work performed at Saluzzi's home.These payments were charged in AIC cash disbursements records to account numbers 601.2 and 501.9 under the headings "office maintenance" and "direct job expense," respectively, and were deducted on the 1974 and 1975 corporate income tax returns of AIC. An itemized bill was submitted by Arnemann to Saluzzi stating the precise lawn service that was performed, but, at Saluzzi's request, Arnemann provided Saluzzi with blank invoices which were filled out by someone other than Arnemann and placed in AIC records to indicate services performed for AIC, and not for Saluzzi. AIC made similar payments during 1973 in the amount of $437.00 and during 1974 in the amount of $574.50 for landscaping *219 services performed by Dennis Ferra at Saluzzi's home. Ferra submitted several invoices to Saluzzi listing services performed such as "repair on job (1 bag of garden clean, labor, bushes)"; "maintenance"; "cutting"; "top soil"; "12 lb. seed"; "labor"; "rebuilding lawn"; etc. The total amount charged for lawn and supplies according to these invoices was $1,273. Saluzzi had Ferra make out an invoice dated April 29, 1973 that described work performed as "repair on job" to AIC and had the AIC bookkeeper charge the $437.00 payment made on April 30, 1973 by AIC on this invoice to the Bowline project. It was accordingly charged to account number 501.3 as a "subcontract cost." During 1974, a duplicate invoice was created by Saluzzi for one of the four checks. He used Ferra's letterhead to indicate that maintenance services were performed for AIC in July in the amount of $94.50. The four checks to Ferra during 1974 totaling $574.50 were charged on AIC cash disbursements records to account number 601.2 as "office maintenance expenses." All amounts paid during both years were deducted on the 1973 and 1974 corporate tax returns of AIC. During 1975, AIC paid for the purchase, installation, *220 and servicing of an automatic lawn sprinkler system from Town & Country Underground Sprinkler Systems for the Saluzzi home. The total cost to AIC of the sprinkler system was $1,975, which was paid in two checks and charged on the cash disbursements records to account number 501.3 as "subcontract costs." The amount was also deducted as a business expense on AIC's 1975 corporate income tax returns. [21]
During 1975, AIC paid for services rendered at the home of Saluzzi by Suburban Glass & Mirror of Norwood, New Jersey (Suburban Glass). Suburban Glass installed mirrors in Saluzzi's dining room, archway, and hutch, and reglazed several windows at a total cost of $477.75.This amount was paid by AIC check, charged to account number 502.9 as a "warehouse expense," and deducted on AIC's 1975 corporate tax return. [22]
During the years 1973 through 1975, AIC paid for electrical and plumbing work performed at Saluzzi's residence by Milt's Electric and Heating of Harrington *221 Park, New Jersey (Milt's). The invoices and work performed by Milt's are as follows: Invoice Date
Description
Invoice Price
May 7, 1973
Supply and installation of toilet,
$765.00
sink, electric water heater, outside
shower; waterlines and vents for
Cabana; supply of 3 lighting fixtures
with pull switch.
Dec. 13, 1973
Disconnection and replacement of
966.76
3 toilets; disconnection and
replacement of 2 vanities;
installation of lines for outlets;
change of switches; change of clock
outlets.
Feb. 13, 1974
Supply, installation and relocation of
413.70
basement lighting; adding switches and
outlets; reconnection of old electric.
June 14, 1974
Installation of outside outlets and
940.45
lights for pool and basketball areas;
installation of front and rear lights
and outlets.
Oct. 2, 1974
Installation of outlets; hanging of
240.45
fixtures; relocation of switch and
thermostat; connection of outlet to
switch; replacement of fixtures,
doorbell connection.
July 15, 1975
Installation of outside outlets.
[23] 265.50
Aug. 13, 1975
Installation of gas, vent lines for
197.90
new dryer; connection of dryer.
*222 The total invoice cost of all work performed was $3,789.76, all of which was paid by AIC checks. In 1973 and 1975, checks totaling $1,731.76 and $460.40, respectively, were written and charged in AIC cash disbursements records to account number 501.3 as "subcontract costs." In 1974, checks totaling $1,354.15 were charged to account number 501.9 as "direct job expenses" and $240.45 was charged to account number 601.2 as "office maintenance." All amounts were deducted on the 1973 through 1975 corporate tax returns of AIC. [24]
During 1973 and 1974, AIC paid Capital Carpet Center, Inc. for the purchase and installation of carpeting in Saluzzi's home in the amounts *223 of $1,208.80 and $559.60, respectively. The former amount was charged to account number 601.2 as an "office maintenance" expense, and the latter amount was charged to account number 501.9 as a "direct job expense." These amounts accordingly were deducted on AIC's 1973 and 1974 corporate income tax returns. [25]
During 1973 and 1975, AIC paid for repairs made by Nautilus Swimming Pool Supply a Service Co. (Nautilus) to the pool located at Saluzzi's residence. The repairs, [26] one in 1973 costing $350 and two others in 1975 costing $502.95 and $1,133.69, were charged on AIC cash disbursements records to account number 501.9 as "direct job expenses" and were deducted on the 1973 and 1975 corporate tax returns of AIC. Although bills for the amounts at issue from Nautilus were issued to Saluzzi at his home address, in the case of the item of $502.95 another duplicate bill from Edward *224 H. Ihnen & Son, Inc.--of which Nautilus was a division--was prepared, addressed to AIC at its corporate address and was charged by Saluzzi to the Bowline project. Edward H. Ihnen & Son, Inc. was at no time engaged to perform services for the Bowline project. During 1975, AIC paid Emerson Concrete Co., Inc. (Emerson) $1,332 for the resurfacing of the driveway of the Saluzzi home. [27] The AIC check was charged on the corporate cash disbursements records to account number 501.3 as "subcontract costs" and this amount was deducted on AIC's 1975 corporate tax return. This check was entered as indicated above on AIC books at the direction of Saluzzi who misinformed bookkeeper Pyda that Emerson was an AIC subcontractor engaged to insulate a precipitator on the Chevron Oil Project. [28]
*225 During 1973 and 1974, AIC paid Kevin Moynihan $2,970 to paint the inside and outside of Saluzzi's residence. The first payment for $1,590, was charged on the corporate cash disbursements records to account number 601.2 as an "office maintenance" expense. The check stub for this payment indicates that Moynihan was paid to paint a turbine insulation jacket for the Bowline project. However, Moynihan was never a subcontractor on the Bowline project. At Saluzzi's instruction, two other payments totaling $1,380 to Moynihan were charged as business expenses in AIC cash disbursements records to account numbers 501.3 and 501.9, as "subcontract costs" and "direct job expense," respectively. All three payments were deducted on the 1973 and 1974 corporate income tax returns of AIC. [29]
During 1974, Raymond Schumacher performed carpentry work at Saluzzi's home. In payment for Schumacher's services, AIC drew two checks in amounts totaling $1,200. *226 [30] On April 9, 1974, two other AIC checks, numbered 3656 and 3657 were drawn, in the amounts of $3,000 and $2,795, respectively, for a total of $5,795. These two April 9, 1974 checks were drawn without Schumacher's knowledge and were not cashed by or paid to Schmacher. Saluzzi endorsed the checks numbered 3656 and 3657 without Schumacher's knowledge or permission and received the full proceeds in cash. Saluzzi obtained a blank letterhead from Schumacher and prepared two invoices to reflect that on March 15, 1974, "labor and material" were provided for AIC worth $1,200, and that on April 1, 1974, "labor and material" were provided for AIC worth $5,795. Although Schumacher was not an AIC subcontractor and did not work on a tank farm project for AIC, Saluzzi instructed Pyda to enter in AIC books the amounts paid by AIC to Schumacher as expenses for subcontracting work on a tank farm project.Consequently, all four checks made payable to Schumacher were charged on AIC cash disbursements records to account number 501.3 as "subcontract costs" and were deducted on the 1974 corporate tax return. *227 Two checks were issued by AIC to Patrick McGuire and J. Ollsen, field engineer and project engineer for Bechtel on the Bowline project, respectively, which were endorsed and cashed by Saluzzi without the knowledge or permission of the payees. [31] Both checks were charged in AIC cash disbursements records to account number 501.9 as "direct job expenses" and were deducted on AIC's 1974 corporate tax return. A note in AIC records dated January 21, 1974, pertaining to one of these checks, contained Saluzzi's instructions to Pyda to write a check to J. Ollsen for $3,000, to be used to pay the following: Ollsen, engineering, $300; Bob Fanning, operating engineer business agent, $1,500; John Tracy, operating engineer job steward, $500; Tex, elevator operator, $300; [32] miscellaneous, $400. The note included the following language: "Hoyst [sic] operator Jackson gets his on a weekly basis depending on amount of lifts." Another note dated March 25, 1974, pertaining to the other check showed Saluzzi's instructions to Pyda to have Cikutovich write a check to Pat McGuire for $3,000 for "motivation gifts." This note broke down by name and job those persons who needed to be "motivated" and read *228 as follows: Pat McGuire
Engineering
$500.00
"Gene"
Teamsters Job Steward
500.00
Roper
Teamsters Business Agent
500.00
Daly
Teamsters Business Agent
500.00
Tiny
Laborer Steward
500.00
Miscellaneous
500.00
The note additionally said: If we are going to bring in nonunion drivers from Canada "atlas Asbestos" I'm going to need ready cash to keep these people off our back. Nick Saluzzi on behalf of AIC made "motivational gifts" in the forms of cash, meals and gifts of property to improve relations with the Bechtel supervisors, with union officials, and other key workmen on the Bowline project. Since AIC was delinquent on payments of its expenses from phase I of this project, Cikutovich and Saluzzi were under great pressure to make phase II a financial success. AIC was paid for work on a completion basis and it was important *229 to it financially to encourage smooth and timely progress and completion of its work in order to receive payment in an expeditious manner. AIC received the benefit of these expenditures. Saluzzi did not himself retain any part of the $11,795. During 1974, AIC drew a check to the order of John Monihan in the amount of $2,000. Monihan was a purchasing agent for the Fred Wendel Company, a customer of AIC. The check was charged in AIC records to "sales promotion," and deducted on the 1974 corporate tax return of AIC. The purpose of this payment is not clear from the record. [33]
Neither Cikutovich nor Saluzzi maintained any diaries, logs, or expense records supporting their business use of their homes during the years 1973 through 1975. They also did not keep any *230 records relating to advances received, or advance-required approval by AIC of home office or entertainment expenses, and rendered no accounting to AIC regarding the funds spent, the purpose for the expenditure, persons entertained, and the dates of such entertainment. AIC maintained no records of advance approval by it of the alleged business use of the Cikutovich or Saluzzi homes. AIC records contained no resolutions, expense account allowance authorizations, records of advance approval of expenses or advances, no records reflecting the dates, items, or places of entertainment, and no records of advance corporate authorization of items disallowed in the statutory notice. A minute book, purporting to contain the minutes of AIC board meetings from 1967 through 1978 was admitted into evidence as a reconstruction of a corporate minute book "lost" in 1976. The minutes purported to be for the February 16, 1973, board meeting reported that only Cikutovich and Saluzzi attended. The "minutes" also stated in part: All Company financial statements, job records, work in progress were reviewed. Lengthy discussions on growing pains of American Insulation's expansion in South Jersey. Joe *231 Serrani was hired and has opened an office in his residence in Forked River, N.J. It was finally agreed [erasure] that between $5,000 and $10,000 be appropriated for necessary renovations to Serrani's Home for the addition of an office. This would include Draftint equipment, calculators, Typewriters, office furniture, carpeting, telephone and etc. Serrani will also be allowed to entertain in his home whenever the occasion arises. [erasures] that office additions be constructed in Nick Saluzzi's and Frank Cikutovich's home. $25,000 to $35,000 will be appropriated for the purpose of creating functional office space in each house. Intercom radios, telephones, furniture, carpeting, painting, shelves[,] Drafting tables and calculators will also be provided as needed. Since the residences are used for the entertainment of customers, business agents, engineers and employees the need for maintenance shall be done by the corporation. * * * Apparently intended to be inserted into the above text in the second erased area was the following: Since our homes are constantly being used for business, either as a direct branch office or entertainment center on behalf of the corporation *232 it was decided that. On its corporate income tax returns for each year including 1973, 1974, and 1975, and on its prior returns for years back to 1969, [34] a "no" answer was indicated by AIC in response to questions specifically asking whether any deduction was being claimed on the returns for expenses connected with an entertainment facility, living accommodations, or employee or family vacations not reported on Form W-2. Saluzzi's business-related deductions were verified by letters from AIC signed by Cikutovich as president and attached to Saluzzi's income tax returns for the years 1970 through 1975. These letters were essentially alike and stated that Saluzzi used his personal automobile in the course of his AIC duties, and further, that: Mr. Saluzzi also has occasion to expend monies for telephone, cigars, entertainment, and other items which are included in the aforesaid amount. Cikutovich's business-related deductions were verified by letters from AIC identical to those used by Saluzzi, except these were signed by Saluzzi as vice president of AIC, and indicated that Cikutovich had incurred business-related expenses. *233 Letters to that effect were attached to Cikutovich's returns for the years, 1970, 1971, 1973, 1974, and 1975. His 1972 Federal income tax return contained a letter from AIC signed by Saluzzi indicating the amount of Cikutovich's 1972 travel expense reimbursement. During May 1976, Revenue Agent John Mahon (Mahon) was assigned to conduct an examination of the 1974 corporate tax return of AIC. Mahon advised the corporation of the audit by letter and received a reply from a Mr. Greenberg, a C.P.A., setting May 27, 1976, as the date for the audit to be held at AIC offices in Hackensack, N.J. A power of attorney executed by AIC authorizing Greenberg to represent it at audit was enclosed with Greenberg's reply. On May 27, 1976, Mahon met with Greenberg, Pyda, and AIC officers and began his audit. During the audit, Mahon requested to see the invoices for various items written off in corporate records as "direct job expenses" including items purchased from Bograd Brothers, Capital Carpets, and Huffman-Koos. Mahon was shown a Bograd Brothers invoice to back up a January 30, 1974, payment of $993.30. The invoice indicated that Bograd Brothers had sold scaffolding to AIC to be used on *234 the Bowline project. Subsequently, another agent, Special Agent Michael Faiella (Faiella) found another Bograd Brothers invoice in AIC files for the same amount, which indicated that office furniture had been purchased on that date. Mahon was shown the following invoices to back up February 8, and February 22, 1974, payments by AIC to Huffman-Koos: Invoice number 096192 indicated that scaffolding, support brackets, and a scaffolding pin were sold to AIC to be delivered to the Bowline project; the stock number heading on the form indicated the number 1985. However, the finish-cover-color-size heading on the invoice indicated color description appropriate to furniture and not to scaffolding. On invoice number 096197, it was also indicated that scaffolding, support brackets and an Allen wrench were sold to AIC for the Bowline project with a stock number of 1757, and a finish-cover-color-size description appropriate to furniture and not to scaffolding. To back up the March 8, and March 28, 1974 payments to Huffman-Koos, Mahon was shown "Rediform" invoices upon which the name of Huffman-Koos had been handwritten. The amounts thereon corresponded to the amounts paid towards Huffman-Koos *235 invoices numbered 096197 and 099091; however, these invoices were entirely different in format from the actual Huffman-Koos invoices. The "Rediform" invoices backing up the March 8, and March 28, 1974, payments indicated that angle support scaffolding brackets and angle and scaffolding support pins were purchased for the Bowline project on March 8, and March 25. Mahon thereafter contacted AIC through Greenberg and requested copies of the four Huffman-Koos invoices, which he received by mail. After examining those copies, Mahon noted that the color descriptions he had seen on invoices numbered 096192 and 096197 at AIC offices had been crossed out. Mahon also requested and obtained copies of the actual sales invoices from Huffman-Koos. Mahon referred the audit to the Criminal Investigation Division where it was accepted for investigation by Special Agent Faiella. Faiella visited AIC offices in July 1976, where he spoke with Cikutovich. When Faiella asked about the AIC versions of the Huffman-Koos invoices, Cikutovich informed him that AIC had purchased furniture which was subsequently given to individuals, and then stated that the bills were for personal items that had been sent *236 to his home and not to the Bowline project. At that time, Cikutovich also told Faiella that the handwriting on the invoices was his and that he had instructed Pyda as to the posting of the invoice amounts in the AIC books. Cikutovich also told Faiella in reply to a question concerning the matter that AIC had not made payments to politicians, engineering firms or contractors. In his meticulous examination of AIC records, Faiella could find no copies of any of the altered Huffman-Koos invoices that had previously been made available to Mahon and was not provided with these items after his specific requests for their production. On June 16, 1980, the United States Attorney for the District of New Jersey filed a four-count criminal information against Cikutovich, who had waived indictment. Cikutovich was charged with the attempted evasion of personal income taxes for the years 1974 and 1975 in violation of section 7201. On July 28, 1980, Cikutovich plead guilty to one count against him, for evasion of a portion of his 1975 income taxes in violation of section 7201, and accordingly was convicted of this charge. On June 16, 1980, the United States criminal information against Saluzzi, *237 who had waived indictment. On July 28, 1980 Saluzzi plead guilty to one count against him, for evasion of a portion of his calendar year 1974 individual income taxes in violation of section 7201, and accordingly was convicted of this charge. In the notice of deficiency mailed to Cikutovich for the year 1975, respondent determined that $2,168 in interest income from eight accounts in four banks had not been reported. Cikutovich offered no evidence to contest this amount. [35]
Neither Cikutovich nor Saluzzi reported any of the sums paid by AIC for their benefit during 1973 through 1975 on their individual income tax returns for these years other than their salaries. During the years at issue, Saluzzi and Cikutovich prepared fictious and altered invoices and improperly charged expenses to work projects to disguise the nature of their expenditures. For example, expenditures for furniture and home services were labeled office equipment and job maintenance respectively, and the fictious invoices were placed in the AIC's records. [36]
*238 Respondent mailed notices of deficiencies on April 9, 1982 to AIC, Cikutovich, and Saluzzi for all years in issue. OPINION Much of the evidence in this case consists of the extensive testimony of Cikutovich and Saluzzi. Suffice it to say that Cikutovich was not a convincing witness. His conduct both before and during the audit as well as on the witness stand provides no reason to give any credence to his testimony. While there may be fragments of candor scattered throughout pages of his testimony, we are not able to separate truth, if any, from fiction. Therefore, we accord substantially no weight to the testimony of Cikutovich. Saluzzi, on the other hand, was at least in part a somewhat credible witness. He was much more willing to admit to the fraudulent acts he had committed; his contentions as to business purposes of expenditures on his home and grounds were less grossly extravagant. At times, such as his cataloging of the problems on the Bowline project, Saluzzi appeared to be forthright, sincere and fully credible. Section 162(a) allows a deduction to a corporation for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on *239 any trade or business.Such expenses must be proximately connected to the business activities of the taxpayer claiming the deduction. Austin Co. v. Commissioner,71 T.C. 955, 967 (1979). Expenses are ordinary if they are normal or customary in the particular industry and are for the current operation of the business. Commissioner v. Tellier,383 U.S. 687 (1966). The Supreme Court has interpreted the word "necessary" as used in a predecessor of section 162(a) to mean appropriate or helpful toward the development of petitioner's business. Welch v. Helvering,290 U.S. 111 (1933). The burden is upon the petitioners to prove that expenses were incurred and that they meet the above requirements of section 162(a). Welch v. Helvering,supra; Rule 142(a).[37]
Section 167 provides a depreciation deduction with respect to "property used in the trade or business." This deduction is available only to a taxpayer having a depreciable interest in the property. Ownership, that is legal *240 title, or a possessory interest such as that of a tenant satisfies the depreciable interest requirement. See Helvering v. F & R Lazarus & Co.,308 U.S. 252 (1939); 4 Mertens Law of Federal Income Taxation, sec. 23.06, p. 56 (1980 Revised Volume). Certain entertainment expenses and gifts that meet section 162 requirements must also comply with section 274 to be deductible. Under section 274(d), a taxpayer must show by adequate records or sufficient corroborating evidence the amount of the expense, the time of the entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, in addition to the business purpose of the item, and the business relationship to the taxpayer of the persons entertained. The regulations promulgated under this section set forth in detail the requirements necessary to prove each element of an expense and its business purpose. Section 1.274-5, Income Tax Regs.
A business expense under section 162(a), however, must be distinguished from a corporate payment made primarily to confer an economic benefit on a shareholder. When a corporation makes an expenditure, which is primarily for a shareholder's benefit *241 without the expectation of repayment, the amount of the expenditure becomes a constructive dividend taxable to the shareholder even though neither the corporation nor the shareholder intended a dividend. Magnon v. Commissioner,73 T.C. 980, 993 (1980); Greenspon v. Commissioner,23 T.C. 138, 151 (1954), revd. on another issue 229 F.2d 947 (8th Cir. 1956). However, a corporate expenditure that only incidentally confers an economic benefit on a shareholder is not a constructive dividend. Whether a distribution was primarily for the benefit of the shareholder and therefore whether it is a constructive dividend is a factual determination. Loftin & Woodard, Inc. v. United States,577 F.2d 1206, 1215 (5th Cir. 1978); Magnon v. Commissioner,supra; see generally 1 Mertens, Law of Federal Income Taxation, sec. 9.08, p. 21 (1981 Revised Volume). If a factual determination is made that an amount is a constructive dividend to a taxpayer, the taxpayer must include the amount of such dividend into his gross income. Section 61. A dividend is defined in section 316(a) as any distribution of property (which includes *242 the performance of services) made by a corporation to its shareholders from earnings and profits accumulated after 1913 or from earnings and profits of the taxable year. Section 316(a); Section 1.316-1, Income Tax Regs.; Magnon v. Commissioner,supra.However, a diversion of corporate funds by a dominant shareholder-officer has been held to constitute income to the shareholder-officer regardless of proof of the existence of sufficient current or accumulated earnings and profits. Davis v. United States,226 F.2d 331 (6th Cir. 1955); United States v. Goldberg,330 F.2d 30, 38 (3d Cir. 1964); Halpern v. Commissioner,T.C. Memo. 1982-31. It is not necessary to classify such diversions as dividends, additional salary, illicit bonuses, commissions or anything other than wrongful diversions. Davis v. United States,supra.
When a corporation takes deductions for expenditures on the private home of a dominant shareholder-officer the proof should be very clear and very certain that the expenses charged to the corporation were legitimate expenses of the corporation. *243 Greenspon v. Commissioner,supra. In Greenspon, a corporation in the business of buying and selling industrial pipe made expenditures to landscape and maintain as a horticultural "showplace" the farm and home of its principal shareholder and chief executive officer. The expenditures for farm tools, fertilizers, shrubbery, etc. were found to be primarily for the benefit of the taxpayer, thus a constructive dividend to him. The Court reasoned that "the relationship between the aesthetic stimulation of a potential customer from the view of an unusual array of shrubbery and flowers and his order for pipe is much too oblique. " 23 T.C. at 151. The cost of farm machinery and equipment that was owned by the corporation and used on the farm was not treated as a constructive dividend. Since the title to this property remained with the corporation, the cost was not added to Greenspon's personal income. It was appropriate, however, to disallow a corporate depreciation deduction with respect thereto. [38]
*244 The circumstances in Greenspon are to be distinguished from those where a corporation reimburses a corporate officer for expenses the officer has incurred at his home in the direct entertainment of customers of the corporation. In Magnon v. Commissioner,supra, a corporation performed electrical contracting services on the investment property owned by the corporation's sole shareholder and president and deducted the costs of these services as a business expense. All of the properties upon which the services were performed were owned by him or with partners and there was no evidence in the record that the corporation was to obtain any interest in the properties upon which it worked. Citing Benes v. Commissioner,42 T.C. 358, 379 (1964), affd, 355 F.2d 929 (6th Cir. 1966), this Court applied the following test where a taxpayer-shareholder had a corporation build property on his behalf, the costs incurred constitute a constructive dividend to the shareholder if: (1) He intends the property to be his from the very beginning, and (2) the shareholder has no intention of repaying the corporation either during or upon completion *245 of the construction. The court found that the services performed were primarily for the stockholder's benefit and that he failed to prove any intention of repaying such amounts. The services were found to be property for the purpose of section 316 and, therefore, such amounts were constructive dividends to him. Issues 1 and 2: Income to Shareholders and Deductions by AIC
(a) Home Entertainment Expenses
Petitioners have conceded a large percentage of the items that were expended by AIC toward the improvement of the Cikutovich and Saluzzi residences and claimed as business-related expenses. These expenses fall into three categories--those which arguably facilitated entertainment, those for a home office and work on the Saluzzi garage and driveway. With respect to the first category, petitioners argue that AIC made expenditures to improve the appearance of, and to provide amenities for, Saluzzi's and Cikutovich's homes in order to provide an atmosphere more conductive to establishing, maintaining, and strengthening the business contacts of AIC. Petitioners contend that at least $1413.44 in 1973, $1,402.55 in 1974, and $7,645.74 in 1975 were deductible as business expenses *246 or, if not deductible, the amounts should be capitalized and depreciated by AIC. [39] It is argued that even though petitioners may have benefited by reason of these expenditures, they were made for a valid business purpose. Petitioners further claim these expenses were disguised on AIC's books in order to hide such expenditures from Balich. They submit that it was entirely reasonable for AIC tp require the individual petitioners to establish, maintain, and strengthen personal relationships by home entertainment although Balich would have objected. Further, petitioners argue that even if the Court should find they failed to establish adequate substantiation of these payments, their payments were nevertheless business expenses and should not be treated as constructive dividends to the two individuals. *247 Respondent maintains that these payments were made for the primary benefit of Cikutovich and Asluzzi and any benefit to ACI was merely incidental. Thus, such payments are not ordinary and necessary within the meaning of section 162(a). Further, petitioners have not met their burden of showing that the corporate funds were expended in a way that was proximately related to AIC business, and cites as factors for this position the residential and social use of the properties by the Cikutoviches and Saluzzis, the original concealment of the true purpose of the expenditures, and the absence of records concerning the business use of the shareholders' homes. [40] Respondent argues that both the expenses at issue which he contends were not ordinary and necessary and the deductions for depreciation should be disallowed. Additionally, respondent contends that such items have not been substantiated for the purposes of section 274(d) amd, thus, cannot be allowed. Further, respondent argues that the amounts spent in the creation of so-called "home entertainment centers" at the homes of Cikutovich and Saluzzi gave rise to constructive dividends from AIC to these shareholders. Respondent also *248 claims that both Cikutovich and Saluzzi regarded these expenditures as additional compensation from AIC to them, although neither included the expenditures in income. We agree with respondent. Although petitioners have attempted to substantiate a business purpose for incurring the unconceded portions of their expenditures, the testimonial evidence establishes no more than an insignificant, incidental business purpose. Petitioners state, probably quite accurately, that it was an ironclad business necessity to maintain good relations with their customers, suppliers, and labor force. Nevertheless, on the basis of the record, [41] petitioners have shown no more than an oblique relationship between customer relations and the maintenance of Saluzzi's pool, the use of outdoor and living room furniture and the various items of yard maintenance. Also, petitioners have completely failed to explain the basis for their allocation of these expenditures between personal benefit and alleged business use. Moreover, petitioners *249 have missed the crucial point. Title to the respective residences at all times remained in the individuals. With respect to the personal property, we have to assume that title vested *250 in the individuals. At least there is no evidence that AIC acquired title. There is neither evidence nor any contention that the individuals were obligated to repay AIC. Neither is there evidence of any agreement for the use of these facilities or items of property by AIC. To the contrary, both residences continued to be used primarily for the living quarters of the two shareholder-officers and their families. Thus, the costs (to the extent not conceded) paid by AIC are clearly taxable income to Cikutovich and Saluzzi, respectively, as constructive dividends, irrespective of earnings and profits. Neither is there any basis for a deduction by AIC of depreciation. None of this property was used in the trade or business of AIC. Greenspon v. Commissioner,23 T.C. at 150-151. Benes v. Commissioner,42 T.C. at 379. [42]Magnon v. Commissioner,73 T.C. at 994. We do not reach respondent's arguments that section 274 applies or that these amounts were additional compensation. *251 With respect to the payments of $976.44 to Scibetta Brothers in 1973 for Cikutovich and of $350 in 1973 and $1,133.69 in 1975 to Nautilus Swimming Pool for Saluzzi, respondent bears the burden of proof because such amounts were raised in the amended answer. Rule 142(a). However, the parties do not dispute the fact that the above payments were made as alleged by respondent. Hence, his burden of proof is met and these amounts are to be treated in the same manner as similar amounts in the statutory notice, that is taxable to the respective individuals and nondeductible by AIC. (b) Home Office Expenses
Petitioners argue that need for home offices arose from their hectic work schedules which required them to do paperwork after regular working hours and on weekends. They contend that AIC required them to maintain an office at their homes and allege that a part of the costs AIC paid for remodeling, building and furnishing the Cikutovich and Saluzzi homes was allocable to creating home offices for officers Cikutovich and Saluzzi for the convenience of AIC. Consequently, petitioners contend that the following amounts are deductible by AIC: $2,569.78 for 1973; $3,724.35 for 1974; *252 and $14,435.70 for 1975. Petitioners alternatively argue that the expenses incurred can be capitalized. [43] Respondent contends that these amounts were expended primarily for the benefit of petitioners Cikutovich and Saluzzi and that any benefit to AIC was merely incidental. Again we agree with respondent. There is on this record considerable doubt as to whether either individual actually established an office in his home and if so whether the claimed amounts were solely used for such purposes. Especially with respect to the Cikutovich residence, the alleged home office appears to have been more of a family room. However, this is beside the point as we analyze the applicable law. We see no difference *253 in principle between these so-called home office expenditures and those for the entertainment centers. In both cases AIC's expenditures increased the value of the respective residences, and contents, a direct benefit to each shareholder-employee. AIC neither retained nor obtained any interest in the property and there is no contention that a debt was created. We do not here have a situation like Feldman v. Commissioner,84 T.C. 1 (1985). Hence the cases of Magnon v. Commissioner,supra;Benes v. Commissioner,supra; and Greenspon v. Commissioner,supra, are controlling. AIC is not entitled to a section 162 deduction or depreciation and the applicable amounts are taxable to Cikutovich and Saluzzi, respectively, as constructive dividends. With respect to the unconceded payments of $76.10 made in 1973 to Huffman-Koos and of $61.00 made in 1975 to the Borough of Paramus, respondent again has the burden of proof because the amounts were raised in respondent's answer. However, petitioners do not dispute that these payments were made or that they were to purchase furniture and a building permit in connection *254 with the Cikutovich residence. Hence, respondent has met his burden. (c) The Saluzzi Garage and Driveway
Petitioners contend that the payments by AIC or $1,332 during 1975 for resurfacing Saluzzi's driveway and $952.50 during 1973 for the purchase and installation of an automatic garage door and door openers were properly deductible by AIC as business expenses. Saluzzi testified that he needed to be at the Bowline project daily and he needed to transport equipment. He maintained that the garage door was necessary so as to prevent his ladder truck from being a neighborhood eyesore and that the heavy usage of the driveway by AIC trucks led to driveway deterioration and hence to the repairs in question. However, he also testified that the driveway was poorly constructed. This evidence fails to establish the business purpose of the expenditures. The business necessity for parking the truck at Saluzzi's house is unclear, and elimination of a neighborhood eyesore was clearly a personal problem. The new garage door added value to the residence and is in the same category for tax purposes as the other home improvements. We recognize that if the AIC trucks used the Saluzzi *255 driveway for legitimate AIC business purposes, and if such use had damaged the driveway, an AIC reimbursement to Saluzzi for repair might be both ordinary and necessary. However, petitioners have not established either the necessity for truck use of the driveway or the fact of damage by such use. Hence these expenditures are not deductible by AIC and are taxable to Saluzzi as dividends under the authorities cited. (d) Sales Promotion Expense/Bad Debt Deduction
AIC deducted $2,000 as a sales promotion expense on its 1974 corporate return. The $2,000 was paid to Monihan. Alternatively, petitioners contend that the amount is properly deductible by AIC under section 166 as a business bad debt or that the $2,000 payment is a sales promotion expense deductible under section 162. In support they argue Monihan was the purchasing agent for one of AIC's major customers and thus it was in AIC's interest to promote good relations with him. Respondent maintains that AIC has not met its burden of proof with respect to either contention. In order to obtain a deduction under section 166(a), a taxpayer must first prove the existence of a bona fide debt, which is "a debt which arises *256 from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166-1(c), Income Tax Regs.; Rule 142(a). No note was ever executed and delivered by Monihan to AIC, no account receivable was set up on AIC's books to reflect such a loan, and no terms or conditions for interest and repayment agreed upon. Also, even if on the basis of this sketchy record we could conclude that a debt had been established, there is no evidence to establish its worthlessness during any year before us. Section 1.166-2, Income Tax Regs. Petitioners have failed to carry their burden of proof as to a bad debt deduction. Moreover, the item was actually characterized on AIC's books as a sales promotion expense. The record contains generalities as to the business relationships between AIC, Monihan and Monihan's employer.We are not able to make any fact finding as to Monihan's exact authority or duty or as to the nature of his employer's business or as to the need for or the effect of doing a favor for Monihan. Petitioners did not present any specific history or pattern of prior business that resulted from Monihan and did not suggest *257 any possible transactions that the $2000 payment was to promote. In fact, the testimony of both Saluzzi and Cikutovich is inconsistent with the contention that this was a payment to promote sales. Petitioners have failed to prove that this $2,000 payment to Monihan was a business expense under section 162. (e) Various On-Site Cash Payments
The petitioners contend that AIC was entitled to deduct $11,795 as business expenses under section 162 for the taxable year 1974. [44] This series of expenditures was used, according to Saluzzi, to facilitate the AIC Bowline project, namely, for payments to union officials to permit use of nonunion truck drivers, to compensate other subcontractors or their employees for additional costs incurred when AIC left scaffolding in place during a union strike, and to various individuals who needed "motivation gifts" to adequately serve AIC's on-site needs. Petitioners argue that section 162(c) does not apply to disallow these payments because payments such as these are the normal business practice in New York state and thus, such payments are both ordinary and necessary. *258 Respondent contends that petitioners have failed to connect the check proceeds to specific individuals, that these payments are not ordinary and necessary under section 162 and in any event deduction cannot be allowed because the payments were illegal within the meaning of New Uork Penal Law section 180.15 and Federal Statute 29 U.S.C. section 186. With respect to the section 162(c) issue, respondent has the burden of proof. Respondent further contends that this aggregate sum, obtained by Saluzzi by forged endorsements, was taxable in total to him. Putting to one side the possible illegality of these payments, we conclude that they were ordinary and necessary under section 162. Saluzzi's testimony as to these payments was credible. We have no doubt that payments of this kind were made to various Bechtel or subcontractor employees and union officials as part of AIC's on-going business. To be deductible under section 162, payments must be ordinary and necessary. This is a factual question to be decided from the circumstances of each case. The term "necessary" means that the expense must be appropriate and helpful for the development of petitioner's business. *259 Commissioner v. Tellier,387 U.S. 687, 689 (1966). Payments must be common in the taxpayer's dealings or of frequent occurrence in the type of business in which the taxpayer is engaged. Deputy v. DuPont,308 U.S. 488 (1940). These payments were made to ensure efficient progress of AIC's work at the Bowline job site; it is clear that such payments were necessary to petitioner's business. Welch v. Helvering,290 U.S. 111 (1933). Further, such payments must also be ordinary with the meaning of section 162. An expense is ordinary if it is normal or customary in the particular industry at issue. Welch v. Helvering,supra.The significance of ordinary is to distinguish between capital expenditures and expenditures for the current operation of the business. Commissioner v. Tellier,supra at 689; NCNB Corp. v. United States,651 F.2d 942, 948 (4th Cir. 1981); Paymond Bertolini Trucking Co. v. Commissioner,736 F.2d 1120 (6th Cir. 1984). That these payments were customary in the industry and a current cost of producing income for the year at issue has been established to *260 our satisfaction by this record. We find them ordinary within the meaning of section 162. However, this does not resolve the issue. Some if not all of these payments were made or given in the form of small gifts of property, meals and cash. Generally, when evidence indicates that a taxpayer incurred a deductible expense but the exact amount of this expense cannot be determined, this Court should make a close approximation of the deduction. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, certain entertainment and gift expenditures are deductible only if they meet both the tests of sections 162(a) and those of 274(a) and (d). The Cohan rule has been made inapplicable to expenditures to which section 274 applies. Sanford v. Commissioner,50 T.C. 823 (1968), affd. 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). Business gift expenditures are clearly subject to section 274, but section 274(e) specifically provides that section 274(a) does not apply to "business meals." Respondent's regulations detail the facts which a taxpayer must establish to come within this exclusion. See section 1.274-2(f)(2)(i), *261 Income Tax Regs. At the very least, a taxpayer must be able to connect the person entertained with his trade or business, and with the time, place and nature of the entertainment as well as the amount of the expenditure. With respect to the meal expenditures at issue here, the petitioners have failed to provide evidence sufficient to qualify them for the section 274(e) exception. Furthermore, even if petitioners had shown they were within the section 274(e) exception, petitioners are required to identify or furnish us with the means for identifying the dollar amount which is within the exception. Out of the check proceeds used by petitioners for payments to union officials and job site workmen, payments were made for meals, gifts of property and direct transfers of cash. Some, if not all, of these payments (other than for business needs) are within the strict substantiation requirements of section 274, including the dollar limitation on gifts in section 274(b). We have before us only three lump sum amounts out of which meals were furnished and gifts of property and cash payments were made. There is no evidence from which we can make an allocation of these amounts to the various *262 categories. Even where the Cohan rule is available, we must have some basis on which to make an estimate. Afshar v. Commissioner,T.C. Memo. 1981-241, affd. by unpublished opinion 692 F.2d 751 (4th Cir. 1983), cert. denied 461 U.S. 928 (1983). On this record we have no choice but to disallow deduction of the $11,795 claimed. See e.g., Hyslope v. Commissioner,21 T.C. 131, 134 (1953); Lewis v. Commissioner,27 T.C. 158, 165 (1956), affd. 253 F.2d 821 (2d Cir. 1958); Geer v. Commissioner,28 T.C. 994, 996 (1957). For this reason we do not reach the section 162(c) aspects of respondent's contention. Respondent also contends that these sums are includible in Saluzzi's income. The mere fact that payments are not deductible by AIC does not automatically result in income to the shareholder. Ashby v. Commissioner,50 T.C. 409, 418 (1968). The disallowed expenses must also represent an economic gain or benefit to the shareholder. *263 Palo Alto Town and Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977). In the present case, we have found as a fact that Saluzzi did not retain any of these sums for his personal benefit, that the amounts were expended by him as an officer of AIC in furtherance of AIC's business. The mere fact that these funds passed through Saluzzi's hands is immaterial. Palo Alto Town & Country Village v. Commissioner,supra.These payments did not benefit Saluzzi personally. Thus, this amount is not to be treated as a constructive dividend to Saluzzi. Palo Alto Town & Country Village v. Commissioner,supra.
Issue 3: Fraud
Respondent determined that part of the underpayments of tax by petitioners AIC and Saluzzi for the taxable years 1973 through 1975 and part of the underpayments by Cikutovich for the taxable years 1974 and 1975 were due to fraud, and imposed additions to tax under section 6653(b). The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation *264 and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving by clear and convincing evidence that some part of an underpayment was due to fraud. Section 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *265 Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The intent to conceal or mislead may be inferred from the pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States,348 U.S. 121, 137 (1954); Otsuki v. Commissioner,supra. Other badges of fraud which may be taken into account are the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner,75 T.C. 1, 20 (1980), and the filing of false documents, Stephenson v. Commissioner,79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Cikutovich was convicted on a charge of income tax evasion under section 7201 for the taxable year 1975 and Saluzzi on a charge of income tax evasion under section 7201 for the taxable year 1974. They are, therefore, estopped from denying fraud as to those years, and *266 have conceded as much in their brief. Otsuki v. Commissioner,supra.We have found deficiencies for such years; therefore, the fraud addition is proper. With respect to AIC, a corporation can act only through individuals who are its officers or employees. In this case we are entitled to impute to AIC the actions and motives of Cikutovich and Saluzzi when they were acting on behalf of AIC. Federbush v. Commissioner,34 T.C. 740 (1960), affd. 325 F.2d 1 (2d Cir. 1963); American Lithofold Corp. v. Commissioner,55 T.C. 904 (1971); M.J. Laputka & Sons, Inc. v. Commissioner,T.C. Memo. 1981-730. Both Cikutovich and Saluzzi benefited from corporate payments of their personal expenses and payments for additions and improvements to their residences and the contents. Petitioners conceded that much of the expenditures originally characterized as corporate in nature actually were personal expenditures which benefited the shareholder-employees. Both individuals testified that the corporate expenditures were a way of getting higher salaries and that concealment was to prevent discovery by Balich. However, *267 even if we accept this as a fact, which we do not, concealment from another shareholder does not excuse the submission of false income tax returns to respondent and the submission of false and altered documents to respondent's agents during the audit, actions which both individuals have admitted and which were done on behalf of AIC as well as the individuals. Moreover, such conduct continued long after the former shareholder had his shares redeemed. Cikutovich and Saluzzi each provided false information to Pyda, the AIC bookkeeper, and thus to the tax return preparer, which is another indicia of fraud. Farber v. Commissioner,43 T.C. 407 (1965). After considering all the various arguments presented by petitioners and respondent and after a thorough examination of the extensive record in this case, we conclude that respondent has shown the fraudulent intent of AIC, Cikutovich and Saluzzi by clear and convincing evidence. Accordingly, the two individuals and AIC are liable for the additions to tax for fraud under section 6653(b). Issue 4: Statute of Limitations
The period of limitations on the assessment and collection of income taxes is generally 3 years. *268 Section 6501(a). In the case of false or fraudulent returns with the intent to evade tax, however, the period of limitations is suspended indefinitely. Section 6501(c)(1). In the instant case, we have found the returns of AIC and of petitioners Cikutovich and Saluzzi to be fraudulent. Thus, the statute of limitations does not bar the assessment or collection of the deficiencies for the years 1973, 1974, and 1975. Decision will be entered for the respondent in docket Nos. 14698-82 and 14884-82. Decision will be entered under Rule 155 in docket No. 14885-82.
Footnotes
1. Cases of the following petitioners have been consolidated: Frank Cikutovich and Josephine Cikutovich, docket No. 14884-82; and Canio Saluzzi and Joan Saluzzi, docket No. 14885-82.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. In docket No. 14698-82, the original deficiencies in the amounts of $3,158 for 1973 and $12,462 for 1974 were eliminated as a result of a net operating loss carryback from the 1976 taxable year of petitioner American Insulation Corporation (AIC). The amount of the deficiencies for these years, without taking into account the subsequent net operating loss carrybacks, is the proper basis for computing the section 6653(b) additions. Simon v. Commissioner,248 F.2d 869 (8th Cir. 1957); Petterson v. Commissioner,19 T.C. 486↩ (1952). 4. In docket Nos. 14884-82 and 14885-82, respondent determined that because no part of the understatement in tax was due to fraud to Josephine Cikutovich or Joan Saluzzi, respectively, the section 6653(b) penalties did not apply to them. We also note that the 1973 year of petitioners Cikutovich is not before us.↩
5. Respondent, in his amended answer in docket No. 14698-82, contends that the following amounts were improperly deducted by AIC on its 1973 and 1975 Forms 1120: ↩
Item
For
1973
1975
Eisele's Nursery
Shrubbery for home of
$265.00
Frank Cikutovich
Scibetta Brothers
Lawn and patio
976.44
furniture for home of
Frank Cikutovich
Nautilus Swimming
Service to swimming
350.00
$1,133.69
Pool Supply &
pool of Canio Saluzzi
Service Co.
Huffman-Koos
Furniture for home of
304.50
Frank Cikutovich
Borough of Paramus
Building permit for
addition to home of
Frank Cikutovich
61.00
$1,895.94
$1,194.69
6. The amended answer asserts an increased deficiency in the amount of $1,456 for the 1975 year but disallows a deduction of $1,194.69. While it appears improbable that a disallowed deduction of $1,194.69 could produce a tax deficiency of $1,456, neither party has commented on this matter, and we have not examined the calculation. ↩
7. In docket No. 14885-82, respondent contends in his amended answer that petitioners failed to report as income on their 1973 and 1975 income tax returns the amounts of $350.00 and $1,133.69, respectively, which amounts were paid by ACI for the benefit of Canio Saluzzi for service to his swimming pool.↩
8. During the years at issue, its principal place of business was in Hackensack, New Jersey.↩
9. The facts as to the number of shares owned are somewhat sketchy. The parties have stipulated that as of March 15, 1975 four-sevenths of the shares were owned by Balich and one-seventh each by the two Cikutovichs and by Saluzzi. It is critical to one aspect of this opinion that Frank Cikutovich and Saluzzi be shareholders during each of the years in issue. Based on the entire record we are convinced that such is a fact. Also on brief in their requested findings of fact counsel have agreed that ownership in the proportions indicated lasted from February 1967 to April 29, 1976 when Balich ceased to be a shareholder.Thus these findings are amply supported.↩
10. Petitioners concede that 75 percent of the amount paid to Huffman-Koos was a nondeductible expenditure made by AIC for the benefit of Cikutovich but contend that $76.10 for 1973 and $698.03 for 1974 are deductible by AIC, or if nondeductible, represent capital items subject to an allowance for depreciation.↩
11. This description and invoice number are taken from the stipulation although the pertinent exhibit (No. 24-X) describes the items as "curio commodes" and shows the invoice numbers as N8159/94340. The discrepancy is immaterial.↩
12. Petitioners concede that 75 percent of the amount paid to Bogard Brothers by AIC was a nondeductible expenditure made for the benefit of Cikutovich but contend that $659.22 for 1974, and $212.50 for 1975 would be deductible by AIC or if nondeductible, represent capital items subject to an allowance for depreciation.↩
13. Petitioners concede that the payment to Duffy Player Piano Co. was an expenditure made for the benefit of Cikutovich and not deductible as a corporate expenditure.↩
14. Petitioners concede that 50 percent of the amount paid to Wells is a nondeductible expenditure made for the benefit of Cikutovich but contend that $87.50 of this amount is deductible or, if nondeductible, represents a capital item subject to an allowance for depreciation.↩
15. The amount of deficiency resulting therefrom was raised in respondent's amended answer in docket No. 14698-82.↩
16. Petitioners concede that 50 percent of the $27,200 paid by AIC to Luppino represented nondeductible expenses for the benefit of Cikutovich but contend that $13,600 is properly deductible by AIC.↩
17. Petitioners conceded at trial that the total $920 amount is not deductible.↩
18. The deficiency resulting from the $976.44 paid in 1973 was raised in respondent's amended answer in docket No. 14698-82. The individual 1973 taxable year of Cikutovich is not before us.↩
19. Petitioners concede that 75 percent of the $1,100 paid by AIC to Floors Beautiful represented nondeductible expenses for the benefit of Cikutovich but contend that the remaining amount of $275.00 represents a deductible expenditure. Petitioners no longer contend it is a depreciable item.↩
20. Petitioners concede these expenses are nondeductible.↩
21. Petitioners concede that the total $1,975 amount represents a nondeductible expenditure for Saluzzi's benefit.↩
22. Petitioners concede this amount was a nondeductible expenditure for Saluzzi's benefit.↩
23. Although the parties have stipulated that a check in the amount of $265.50 was paid by AIC and the invoice from Milt's reflects this amount, the amount of $262.50 appears in the statutory notice issued to the Saluzzis.↩
24. Petitioners concede that 50 percent of the sums paid by AIC to Milt's during 1973 through 1975 represented nondeductible expenditures for Saluzzi's benefit but contend that the remaining sums of $865.88 for 1973, $797.32 for 1974, and $230.20 for 1975 represent properly deductible items.↩
25. Petitioners concede that 50 percent of the amounts paid by AIC to Capital Carpet Center, Inc. represent nondeductible expenditures for Saluzzi's benefit but contend that the amount of $604.40 for the 1973 taxable year and the amount of $279.80 for the 1974 taxable year are properly deductible.↩
26. Two of these items, $350 in 1973 and $1,133.69 in 1975 were raised by respondent for the first time in the amended answer.↩
27. Petitioners sought to justify this expenditure by explaining that the installation of the new garage doors (see p. 19 supra↩) left a hole in the driveway. Also the parking of heavy trucks caused damage, at least in part because the driveway had not been well constructed. 28. During the years at issue, AIC was engaged as an insulation contractor for several tank farm projects for Chevron and Hess Oil Companies. These jobs involved the insulation of pipes and equipment at the tank farms.↩
29. Petitioners concede that 50 percent of these amounts represent nondeductible expenditures for the benefit of Saluzzi but contend that the remaining $795 for the 1973 taxable year and $690 for the 1974 taxable year are properly deductible.↩
30. Petitioners concede that 50 percent of the amounts deducted with reference to these two checks represent nondeductible expenditures for Saluzzi's benefit but contend that $600 is properly deductible.↩
31. These checks are summarized as follows: ↩
Check Number
Date
Payee
Amount
3144
1-24-74
J. Ollsen
$3,000
3631
4-03-74
Patrick McGuire
3,000
Total
$6,000
32. The notation for this expense indicates that Tex had to be given a bottle of bourbon each week.↩
33. Although petitioners contend that this payment is deductible as a debt that became worthless during 1974, there is no evidence in AIC records of notes executed by Monihan during 1973 through 1975, no liability ledgers, repayment schedules, records reflecting demands for repayment, efforts at collection, or any other records establishing the existence of, or the worthlessness of, any loans to Monihan from AIC.↩
34. There is no ACI return in the record for 1970.↩
35. Although not formally conceded, the failure to offer evidence or to argue on brief is tantamount to a concession and is so treated.↩
36. The reasons given by Cikutovich and Saluzzi for this behavior were two fold: (1) they felt they were tied to antiquated salaries in their contracts and should get more money since they did the vast majority of the work; and (2) they were in the process of acquiring Balich's share of the company and did not want these expenditures to increase Balich's sales price for his interest.↩
37. However, to the extent items were first raised in the amended answer, the burden of proof is on the respondent. Rule 142(a).↩
38. The Commissioner did not raise the issue of whether an amount equal to the fair rental value of the farm machinery and equipment should have been treated as a constructive dividend to the shareholder.↩
39. The home entertainment expenses are composed of the following: Year
Cikutovich
Saluzzi
AIC
1973
$976.44
$437.00
$1413.44
1974
1402.55
1402.55
1975
1042.50
4653.24
5695.74
The parties have stipulated that $350.00 was paid in 1973 by AIC for repairs made by Nautilus Swimming Pool Supply and Service Co. to the swimming pool located on Saluzzi's residence which amount petitioners contend is a fully deductible expense. Hence, this sum should be added to the $1,413.44 claimed for 1973. In general, these amounts were expended for lawn care, lawn or patio furniture, pool repairs, and dining room furniture for Cikutovich.↩
40. Neither petitioners nor respondent discuss whether respondent has met his burden of proof with respect to the unconceded amounts raised in the amended answer.↩
41. The only documentary evidence in the record to support business use by AIC is the reconstructed corporate minute sheets for the years at issue. These "reconstructed" minutes were in Saluzzi's handwriting and were prepared after a criminal investigation of petitioners had commenced with respect to some of the years at issue, and therefore, when the temptation to fabricate was great. Although petitioners claim that these minutes were prepared sometime after February 10, 1976, when they discovered that the original AIC minute book was lost, they have failed to prove the existence of the original minutes, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), or that the loss of this minute book was due to circumstances beyond their control. Barry v. Commissioner,T.C. Memo. 1978-250↩. We find this evidence of no probative value. Petitioners also provided protographs of the people they allegedly entertained but we find these of little, if any, probative value.
42. To the extent petitioners argue that business associates were entertained at the poolside patio of Saluzzi, we find that they have not shown that the parties given were directly related to the active conduct of AIC business or that the pool was used primarily for the furtherance of AIC business. Sec. 274(a)↩. While reimbursement by AIC to Cikutovich and Saluzzi for out-of-pocket costs for business entertainment might have been appropriate, petitioners have not raised this issue and there are no facts upon which any deduction could be based.
43. The amounts contended for under this heading represent 25 percent of the costs of home furnishings purchased by Cikutovich from Huffman-Koos and Bograd Brothers, 25 percent of the costs of flooring Floors Beautiful, 50 percent of amounts paid to build the addition on the Cikutovich residence, and 50 percent of amounts paid for painting, electrical, plumbing, and carpentry work, and for carpeting in and to the Saluzzi residence. Section 280A is not applicable to these years.↩
44. This amount is comprised of: (1) $5,795 from two AIC checks drawn to the order of Schumacher, without Schumacher's knowledge, and subsequently endorsed and cashed by Saluzzi; (2) $3,000 from and AIC check drawn to the order of Ollsen, but endorsed and cashed by Saluzzi; and (3) $3,000 from an AIC check drawn to McGuire but endorsed and cashed by Saluzzi.↩